OPINION OF THE COURT
Edward M. Rappaport, J.
The above captioned lawsuit is premised upon unlawful interference with the property and control of a religious *844 corporation. It was commenced by the filing of a verified complaint wherein the plaintiff sets forth two causes of action; namely (1) recovery of possession of real property and treble damages for forcible entry and detainer, and (2) a declaratory judgment. The defendants deny all allegations.
After conducting a bench trial on this action which commenced on November 15, 2002 and concluded on December 20, 2002, this court is now called upon to marshal the evidence and determine the factual issues generated by the parties, the sworn testimony of the parties and the documentary evidence submitted herein. The following constitutes the court’s findings of fact and conclusions of law.
Findings of Fact
In 1967 Pastor Eliza Brown founded the St. Matthew Church of Christ with her family, including daughter Earlene Phair. Services and prayer meetings were conducted in Pastor Brown’s home. Thereafter, a storefront house of worship, located at 234 Buffalo Avenue in Brooklyn, New York, was established. The Brown family worked together to renovate and repair the facility for a house of worship. On October 29, 1982, St. Matthew purchased 232 Buffalo Avenue, and to this date it is the place of worship for St. Matthew’s parishioners.
In 1968, St. Matthew was incorporated as a church in accordance with article 10 of the Religious Corporations Law. The certificate of incorporation lists six church members as trustees, to be elected annually. Phair was involved with functions of the church since 1968, serving as the church’s trustee, secretary, vice-president, and assistant pastor, with the exception of four years when she lived out of state.
Although the certificate of incorporation mandates annual elections, St. Matthew was a family operated organization and was managed accordingly. Most of the members and trustees were relatives or friends of Pastor Brown and Phair. Elections were not conducted; rather, the church positions, including trustee positions, were filled by Pastor Brown. Similarly, there were no corporate bylaws. The daily business transactions were handled by a trustee and an acting trustee; all of the financial transactions were handled by Pastor Brown and Phair.
Pastor Brown was the pastor of St. Matthew from its creation until February 1999. At that time she relinquished her reign as pastor due to illness. Phair testified that Pastor Brown indicated her desire that her daughter, Phair, become the pastor of St. Matthew. This was challenged in the testimony of *845 Linda Williams, a church member since 1969. On March 8, 1999, the church board held a business meeting, during which the board members were given the opportunity to object to the installation of Phair as pastor. By tacit agreement of the board members and secretaries, Phair became the pastor of St. Matthew. The minutes of the March 8, 1999 meeting, written by Phair, state there was an announcement that Phair was following Pastor Brown’s “command to take the congregation, and church onward.” Pastor Brown died on January 1, 2000. Phair operated St. Matthew as pastor from March 1999 until April 1, 2000.[1]
At that time the Northeastern District Assembly became involved with the daily operations of St. Matthew. Defendant NEDA is an independent association of approximately 32 Christian churches in the northeastern United States. NEDA is a division of the Church of Christ, Disciples of Christ religious denomination, and is currently headed by the presiding Bishop, Marvin Creech, the codefendant. NEDA has its own constitution and bylaws. While NEDA’s constitution and bylaws state that “The Council/Elders Board shall have authority to act in religious matters pertaining to the hearings and disciplinary [sic] of matters,” the assembly is not permitted to intervene in the “day to day business” of the member churches.
St. Matthew became a member of NEDA in the late 1960’s, when the two parties entered into a fellowship relationship in which they held religious functions and prayed together with affiliated churches. St. Matthew also paid dues to NEDA, sent them financial statements and voted in some NEDA elections. Bishop Creech paid no dues nor was he a member of the church.
In February 2000, NEDA received letters and phone calls from approximately six people purporting to be church members expressing their displeasure with the choice of Phair as their pastor. Although plaintiff disputes that the complaints came from current members of St. Matthew, at least two of the complaints levied were by relatives of Phair, to wit: cousin Ms. Washington and sister-in-law Ethel Brown. Consequently, Bishop Creech did not accept Phair’s authority as the pastor of St. Matthew. In response, Bishop Creech called a meeting of NEDA’s Board of Elders at St. Matthew.
*846 Bishop Creech notified Phair of the meeting in writing and by phone requesting her presence; Phair attended. On April 1, 2000, it was determined by the elders and Bishop Creech that Phair was relieved of her pastoral duties. The elders’ determination appears to be premised on the finding that Phair assumed the pastoral position by designation rather than election. Bishop Creech informed Phair that she was no longer allowed to continue her position at St. Matthew. Furthermore, Bishop Creech advised the trustees that they would be taking instructions from him. He determined that a church election was necessary to determine who was to hold the pastoral position; Phair was to be included as a candidate. Thereafter, three church members, Sister Milider, Deacon Jones and Mr. T. Haynes, went to Chase Manhattan Bank and froze the church’s checking and savings accounts.
Phair’s subsequent actions clearly demonstrated her refusal to accept her removal as pastor of St. Matthew. Although Phair never returned to the church after the April 1, 2000 meeting, she held church trustee meetings in her home. The meetings were attended by Phair’s two sons, who were two of the three trustees. Also, Phair phoned the police attempting to prevent Bishop Creech from conducting services at St. Matthew and had the locks changed on the church building. In response, the defendants subsequently had the locks changed on the church, barring Phair from the premises. On October 17, and November 2, 2001, Phair served two notices to quit on Bishop Creech and NEDA.
After the April 1, 2000 meeting, Bishop Creech also engaged in several aggressive actions to remove any vestiges of Phair’s leadership in the church. On April 3rd of that year, in a letter to Phair, Bishop Creech asked for the deed and title to the church and all of its corporate and financial records. On June 29, 2000, Bishop Creech wrote to Chase Manhattan Bank alleging that Phair is not now, nor ever was, the pastor of St. Matthew and directed that “all request [sic] for information, legal and/or religious matters should be referred directly to me.” On November 8, 2000, Bishop Creech took over the daily operations of St. Matthew and announced that he was the “overseer pastor” for St. Matthew. Since April 1, 2000, NEDA has also sent a visiting pastor to conduct Sunday church services at St. Matthew.
As a member of the church, trustee, and former pastor, Phair brought this action on behalf of St. Matthew Church seeking a declaratory judgment permanently enjoining NEDA from any *847 further involvement with St. Matthew’s daily operation, religious activities and real estate, and to restore herself as pastor. The plaintiff further seeks compensation from Bishop Creech and NEDA for its costs and expenses in litigating this matter and seeks treble damages for improperly entering and detaining its real property.
The defendants contend they have the authority to oversee the election of a new pastor at St. Matthew since the church is a member of NEDA, and this has been NEDA’s policy through the years. Defendants further assert that Phair had no power to initiate legal action on behalf of St. Matthew because she was not elected to her position of authority, and the church’s board of trustees did not approve the action. Additionally, defendants allege that the court lacks power to restore Phair to her prior position, because the choice of a pastor is a religious matter and, therefore, not within the subject matter jurisdiction of this court.
Conclusions of Law
This case presents three issues: (1) whether under Religious Corporations Law a religious corporation may have its pastor designated by appointment, rather than through election by its trustees or its congregation; (2) whether a private religious corporation is subject to the authority of an organization of which it is a member; and (3) whether Phair has sufficient authority as a corporate trustee and founding family member of the church to sue on behalf of St. Matthew.
Appointment of a Pastor:
Before addressing the current controversy, it is necessary to consider whether this court has the power to inquire into the procedures involved in a church’s determination of its pastor. Defendants argue that the choice of pastor is an ecclesiastical matter. Therefore, this court lacks the jurisdiction to settle this dispute, because it would be a violation of the Establishment Clause of the First Amendment of the United States Constitution (see Hayes v Board of Trustees, 225 NYS2d 316, 320 [1962]). Courts may intervene in church disputes involving civil rights or property which can be resolved without implicating religious doctrine or belief (Mays v Burrell, 124 AD2d 714, 714 [1986]). In Rector, Churchwardens & Vestrymen of Church of Holy Trinity v Melish, the Appellate Division, Second Department, reversed the lower court and chose to intervene in a church dispute where the interim rector and a faction within an Episcopal Church refused to relinquish control of the pulpit *848 and church property to the newly elected rector (4 AD2d 256 [1957]). The Court held that “[although the matter of selecting a clergyman for a church is ecclesiastical, it is within the province of the court to determine a dispute as to a given selection where, as here, questions of control and management of temporalities will be settled by the determination of such disputed ecclesiastical matter.” (id. at 259 [citations omitted].)
Courts have the jurisdiction to decide church disputes when they rely on neutral principles of law in rendering their decision (Langford v Roman Catholic Diocese of Brooklyn, 177 Misc 2d 897 [1998]). A religious dispute may be resolved by neutral principles provided there are
“[1] ‘wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations’ * * *
“[2] that there exist neutral facts to which to apply those rules. Neutral facts consist of ‘evidence from which the court may discern the objective intention - of the parties’ such as the ‘language of* * * deeds, the terms of [a] local church charter * * * State statutes governing the holding of church property [and the like]’ * * * without resorting to matters of doctrine or dogma.” (Id. at 899-900, quoting Elmora Hebrew Ctr., Inc. v Fishman, 125 NJ 404, 414-415, 593 A2d 725, 730 [1991] and First Presbyt. Church of Schenectady v United Presbyt. Church in U.S. of Am., 62 NY2d 110, 121-122 [1984].)
A dispute over the control of a religious corporation may be resolved judicially provided the court passes judgment “objectively” without involving theological matters.
The Religious Corporations Law, however, does not place any stipulations upon the proper method for choosing a pastor or other clergyman. “The Religious Corporations Law is silent as to the method or procedure to be followed for the appointment of a pastor.” (Hayes, 225 NYS2d at 319.) Article 1, § 2 notes that “[t]he term ‘clergyman’ and the term ‘minister’ include a duly authorized pastor, * * * a person having authority from, or in accordance with, the rules and regulations of the governing ecclesiastical body of the denomination or order, if any, to which the church belongs” (emphasis added). Article 2, § 25 also indicates
“[N]o provision of this chapter authorizes the calling, settlement, dismissal or removal of a minister, * * * and a meeting of a church corporation for *849 any purpose shall be called * * * and notice of such meeting given * * * and the qualification of voters thereat determined, not as required by any provision of this chapter but only according to the aforesaid laws and regulations, practice, discipline, rules and usages of the religious denomination or ecclesiastical governing body, if any, with which the church corporation is connected.”
Individual churches or governing national religious organizations must themselves decide which procedures they will follow to choose their pastor or minister. Although Religious Corporations Law, article 10, § 200 states that the trustees of a religious corporation do not have the power to remove members of the clergy or change their salary, it does not address how ministers or pastors should be chosen. Neither party directed the court to any state law directing the manner in which the pastor of a church is to be chosen nor was this court able to locate any such law.
St. Matthew has no written constitution, bylaws, or specified procedure to appoint a pastor. Since the founding of the church, Pastor Brown was the undisputed pastor and appointed all of its officers, many of whom were her relatives. Testimony of Phair and the trustees indicates that the church was largely run by the Brown/Phair family, and its daily operation was governed by unwritten traditions and practices. The lack of church bylaws or constitution suggests that there are few objective neutral principles upon which this court may rely to determine whether Phair is the rightful pastor or what process the church may use to determine a new pastor after Pastor Brown’s death.
St. Matthew’s certificate of incorporation, paragraph six, dictates that the church should have annual elections on March 12, and that the terms of each trustee would be for one year. The fourth paragraph of the certificate of incorporation dictates that St. Matthew have six trustees. Article 10, § 193 of the Religious Corporations Law states that the purpose of a certificate of incorporation is to set “forth the matters so determined at [the trustee] meeting[s], the trustees elected thereat and the terms of office for which they were respectively elected * * The number of trustees specified in the certificate of incorporation is also protected from change by section 197, which holds that any change in the number of trustees must be determined “at an annual corporate meeting.”
The procedures governing corporate trustee meetings are well defined in the Religious Corporations Law. Pursuant to *850 section 195 all members of a church in good standing are entitled to vote in corporate meetings subject to the provisions of the religious organization. The terms of trustees are to be three years. There must be at least six qualified voters present at corporate meetings to constitute a quorum, and the meetings are to be presided over by the church minister or the “officiating minister thereof’ who is required to “declare the result of the votes cast on any matter.” (Religious Corporations Law § 195.) Such elections for trustees are to be administered by ballot, and the polls are required to be kept open for at least one hour. Furthermore, Religious Corporations Law § 194 mandates that an announcement of the trustees’ annual meeting is to be given to the congregation “to give to those entitled to vote, and who are interested in the affairs of the body, an opportunity to be present, and to have a voice in the management of the organization.” (Matter of Kaminsky, 251 App Div 132, 137 [1937].) The Court in Kaminsky notes that “[failure to comply with the requirements of the statute * * * constitutes a ground for vacating the election.” (Id.)
Based upon the testimony of church members and Phair, it is evident that St. Matthew does not have any properly elected trustees; since the founding of the church, no elections for corporate trustees were held. Phair and trustee Henry Phair testified that trusteeship continued from year to year by appointment. It is clear that St. Matthew did not follow the election requirements specified by the church certificate of incorporation, and there is no evidence that members of the congregation were ever consulted about any of these appointments. Consequently, this court has no basis for affirming Phair’s position as pastor, since the church had no legally elected corporate officers.
St. Matthew’s failure to properly elect trustees pursuant to its certificate of incorporation and the Religious Corporations Law also has property implications. Since this dispute arose, the defendants allegedly trespassed upon and detained the church’s real property, interfered with church bank accounts, and improperly involved themselves with daily church activities. Religious Corporations Law, article 2, § 5 holds that the duly elected trustees of the corporation have “custody and control” of all of the property of the corporation. However, in this case, St. Matthew’s failure to properly elect corporate officers to oversee the administration of its property and corporate affairs leaves a question as to who has custody and control of the corporate property.
*851 National Religious Organization’s Authority:
Whether the affairs of an incorporated church are controlled by the church itself or by a national organization depends on how the religious corporation is organized. New York State recognizes two classes of organization which determine religious corporations’ control over their affairs: congregational and hierarchical (see New York Dist. of Assemblies of God v Calvary Assembly of God, 64 AD2d 311, 313 [1978]). A hierarchical religious society is one which was organized “as a body” in conjunction with other churches of the same religion and which is directed by “ ‘a common ruling convocation or ecclesiastic head’ ” (id., quoting Kedroff v St. Nicholas Cathedral, 344 US 94, 110 [1952]). Congregationally organized religious societies, however, are “independent,” self-governing organizations controlled “ ‘by a majority of its members or by other such local organism as it may have instituted for the purpose of ecclesiastical government.’ ” (Id. [citation omitted].)
To determine the organization of a church, a court must examine any constitution or regulations of the corporation as well as “the history of the relationship between the * * * church and its alleged overseer in the scheme of the protestant hierarchy.” (Id. at 313.) It is well established that St. Matthew had no bylaws or constitution. St. Matthew’s certificate of incorporation states that the church was incorporated as a “Disciples of Christ” church and that the church would “hold and conduct religious services in accordance with the Church of Christ, Disciples of Christ.” In the case New York Dist. of Assemblies of God, however, the Court determined that incorporation under article 10 does not necessarily indicate that a church is a hierarchical organization (id. at 314). In order to determine whether St. Matthew was subject to the authority of NEDA and its parent organization Church of Christ, Disciples of Christ, it is necessary to examine the history of these organizations.
Defendants assert that because St. Matthew lacks any corporate officers or bylaws by which the court may determine the procedure to elect their pastor, the church was subject to the hierarchical control of NEDA. The defendants further contend that St. Matthew’s participation in NEDA events, sharing of financial records, paying of dues, as well as Phair’s ordination by NEDA, made it subject to the authority of NEDA and the Disciples of Christ national organization. Bishop Creech testified that he believed NEDA had the right to remove Phair and direct pastoral elections and to intervene in the day- *852 to-day affairs of St. Matthew, even though he could not point to any section in NEDA bylaws authorizing such actions. Plaintiff testified that St. Matthew is a congregationally organized church and is not subject to the hierarchal control of an organization of which it is merely a member.
Plaintiff’s testimony establishes that the banking and administration of the church property was handled by Pastor Brown, Phair, and the church trustees. St. Matthew never received grants or borrowed money from NEDA. According to Phair’s testimony, St. Matthew was in fellowship with NEDA and Bishop Creech. Both Phair and trustee Henry Phair testified that the fellowship entailed sharing religious events with other member churches and voting in some NEDA elections. Despite this involvement, St. Matthew autonomously controlled its own affairs and was not managed by NEDA prior to April 1, 2000.
Upon Phair’s own admission, St. Matthew furnished NEDA with financial statements, voted in some NEDA elections, and paid dues to the organization. Defendants contend that this involvement of NEDA with St. Matthew is evidence that the church was subject to the ecclesiastical control of NEDA. In New York Dist. of Assemblies of God, the plaintiff church sued the local district of the national organization seeking a declaratory judgment stating the church was not subject to the authority of the organization. The Appellate Division, Third Department, held that the “[m]ere involvement [of a church] in the ecclesiastical affairs of the [organization] does not necessarily subject [the church] to the control of that body insofar as its property matters may be concerned.” (Id. at 314.) The Court opined that the degree to which a church is subject to the ecclesiastical authority of a regional or national organization depends upon the extent of the church’s prior involvement with the parent organization, as well as the extent to which the national denominational organization has controlled its member churches historically (id. at 315).
Defendants, however, urge this court to follow Conklin v State of New York in determining that the history of St. Matthew’s relation to NEDA indicates that the church is subject to the authority of a national religious organization (284 App Div 193 [1954]). In Conklin, the plaintiffs, trustees of an unincorporated Methodist Church and the national Methodist Conference, sued the state for compensation after the church and its land, originally deeded directly to the church, were appropriated by the Palisades Interstate Park Commission. The Meth *853 odist Conference was successful in the trial court, but the church appealed, claiming that it was independent of the national organization and was the rightful owner of the property. The Court held that, because the property was given to the church in trust “for the promulgation of the tenets and doctrines of the Methodist Episcopal Church,” and that the American Methodist Church was organized in a hierarchical fashion, that the church property was the possession of the national Methodist Church (id. at 196-197).
However, the present matter is easily distinguished from Conklin. First, St. Matthew incorporated under article 10 of the Religious Corporations Law and designated its own clergy, unlike the unincorporated Johnsontown church in Conklin, which had its ministers appointed by the Newark Annual Conference {id. at 195). Second, the title to the property is in the corporate name, St. Matthew, for its congregants, unlike the deeded property in Conklin, which the Court determined “implied a trust for the promulgation of the tenets and doctrines of the Methodist Episcopal Church.” {Id. at 196-197.) There was no trust created for the promotion of the doctrine of the Disciples of Christ or NEDA. Furthermore, Conklin involves a direct dispute over the ownership of deeded church property, not an ecclesiastical dispute over the pastorship of the church.
NEDA and the Church of Christ, Disciples of Christ also are not organized hierarchically. The Constitution of the General Assembly Church of Christ, Disciples of Christ, International, article II, § 1 states that the purpose of the General Assembly is “[t]o promote unity among the Churches of Christ throughout the General Assembly.” Article II, § 2 of NEDA’s Constitution contains an identical provision suggesting that its purpose is to promote cooperation among the churches. This language indicates that the national organization allows its member churches autonomy in governing their affairs. The purpose of the general assembly is “to promote unity,” not to impose its will.
NEDA’s bylaws section 18 (a) declares that the church “may elect a pastor ninety (90) days after the vacancy of a deceased pastor” (emphasis added). The Constitution of the Church of Christ, Disciples of Christ contains no corresponding provision allowing for the church to fill the pastoral positions of member churches in the event of a vacancy. NEDA’s bylaws also are silent on whether an individual church may independently appoint or elect an ordained pastor to fill a vacancy. According to *854 the testimony of Bishop Creech, NEDA believed that its bylaws allowed it to direct elections of its member churches. NEDA’s Constitution, article V, § 7, however, relegates the authority of the “Council/Elders Board” to religious matters “pertaining to the hearings and disciplinary [sic] of ministers” (see also NEDA bylaws § 13). Hence, this situation is different from a Roman Catholic, Presbyterian, or an Episcopal Church where the individual churches are generally incorporated in connection with governing bodies and are subject to the control of such bodies and their constitutions (see, e.g., Religious Corporations Law, art 4, § 61).[2]
St. Matthew’s association with NEDA was lax with regard to ecclesiastical matters. While St. Matthew’s certificate of incorporation states that it is incorporated as St. Matthew Church of Christ, Disciples of Christ, Inc., the third paragraph mandates only that the church will “hold and conduct religious services in accordance with the church of Christ, disciples of Christ” (first emphasis added). The certificate of incorporation clearly states that initially the church only consented to follow the “religious services” of the Disciples of Christ, not that the church consented to the hierarchical authority of NEDA or its parent organization Church of Christ, Disciples of Christ.
Defendants presented no evidence suggesting that NEDA was involved with any of the church’s ecclesiastical affairs prior to the April 1, 2000 meeting. Upon direct examination, Bishop Creech testified that St. Matthew never agreed in writing to let NEDA govern its affairs. This was confirmed by trustee Henry Phair’s testimony. Bishop Creech further testified that any church may choose to withdraw its membership with NEDA by a vote of its congregation. In a suit to compel a church to hold a membership meeting to elect trustees, the Third Department determined that the church members’ agreement to follow the bylaws of the Central Diocesan Establishment is evidence that the “church subjected itself to the hierarchical ecclesiastical authority” of this national governing body (Matter of Kissel v Russian Orthodox Greek Catholic Holy *855 Trinity Church of Yonkers, 103 AD2d 830, 831 [1984]). Therefore, in determining whether a church is subject to the hierarchy of a national organization, an agreement by the church or its members is dispositive of the church’s intent to submit to such authority.
In this case, there is no corresponding agreement by either St. Matthew or its members to follow the bylaws or the constitution of NEDA or the Church of Christ, Disciples of Christ organization. Nor did the church agree to be subject to NEDA’s control. In her testimony, Phair claimed that the extent of St. Matthew’s ecclesiastical affiliation with NEDA was that the church participated in religious events with other affiliated churches and that NEDA granted her an evangelical license and ordained her. The relationship between St. Matthew and NEDA was not one of subordination to an ecclesiastical hierarchy.
Bishop Creech alleges that NEDA had the right to remove Phair, because NEDA’s bylaws, specifically paragraph 18, allowed for NEDA to direct church elections within 90 days after the “vacancy of a deceased pastor.” He admitted, however, that NEDA had not yet directed elections for the pastor of St. Matthew as of the trial, but had taken over the daily running of the church. NEDA took over the operations of St. Matthew because the church was not operating in accordance with the district assembly’s bylaws, yet NEDA is guilty of the same misconduct. Bishop Creech also claimed that it is the custom of NEDA to intervene in church affairs when there are controversies surrounding pastoral relations and church affairs, but admitted that the organization had never actually removed a pastor from his or her church position or taken over a church’s administration.
In this battle of ecclesiastical traditions and customs it is argued that this court lacks the power to determine whether Phair was properly chosen to be the pastor of St. Matthew. It has been determined that it would be a violation of the First Amendment for the court to intervene in a church’s choice or manner of choosing its own pastor where no neutral criteria may be used. If this is the case, the court is also not in the position to affirm NEDA’s authority to direct elections. The Second Department has determined, however, that ecclesiastical matters such as a church’s determination of a clergyman can be decided by a court if the management of the church’s temporalities will be settled by the determination of such issues {see Rector, Churchwardens & Vestrymen of Church of *856 Holy Trinity v Melish, 4 AD2d 256, 259 [1957]). In the present case, NEDA’s involvement with all of the aspects of the administration of St. Matthew suggests a conflict of interests. This involvement further necessitates this court of equity to enjoin NEDA and Bishop Creech from any further involvement with the church’s management or with the impending trustee elections. If the church and its trustees wish to involve NEDA in determining its pastor, they may do so at a latter date after safeguards are in place to protect the church and its property.
Phair’s Standing to Sue on Behalf of St. Matthew Church:
The defendants contend that Phair lacks standing to act on behalf of the corporation to bring an action in the name of St. Matthew Church of Christ, Inc. While Phair met with the de facto trustees Henry and Willie Phair before commencing this action on behalf of St. Matthew, there was no official board of trustees’ meeting called. Indeed, Phair claims that her authority to bring this action on behalf of St. Matthew stems from her position as a trustee of the corporation. However, as we determined above, St. Matthew had no properly elected corporate trustees.
In Krehel v Eastern Orthodox Church in Am., the court held that while “a corporate executive may have a general right to employ attorneys * * * an individual trustee of a religious corporation is clearly not so empowered” (22 Misc 2d 522, 523-524 [1959], citing Religious Corporations Law § 5). An individual trustee of a religious corporation is not a general agent, but a special agent of the religious corporation and, as such, does not have the authority to hire an attorney without the approval of the entire board (see Matter of Congregation Ansce Kesser [Jewish Community Ctr. of Corona], 5 AD2d 1011, 1013 [1958]).[3] Acting in her capacity as a trustee, Phair could only have initiated an action on behalf of St. Matthew when acting with the approval of the board of trustees. Here, she was not authorized by the board of trustees to employ counsel on behalf of the religious corporation.
The defendants, however, did not move to dismiss the action based upon plaintiffs lack of standing prior to or during the trial. The first time defendants raised the issue of plaintiffs lack of standing was in the posttrial finding of fact and conclusions of law. Since this issue was not raised in a timely man *857 ner and in the interest of justice, defendants’ argument is rejected.
The defendants’ argument that Phair was no longer an active member of St. Matthew Church is likewise unavailing. Although defendants argue that Phair absented herself from St. Matthew after her removal as pastor, this argument is circular. The defendants interjected NEDA into the operation of St. Matthew, which led to Phair’s removal, and now claim that she is no longer an active member. Such an argument is disingenuous; it appears that the defendants are attempting to profit from their own questionable conduct.
The purpose of the Religious Corporations Law is to “ ‘provide for an orderly method for the administration of the property and temporalities dedicated to the use of religious groups and to preserve them from exploitation by those who might divert them from the true beneficiaries of the trust.’ ” (Rector, Churchwardens & Vestrymen of Church of Holy Trinity v Melish, 4 AD2d at 261 [emphasis added], quoting Saint Nicholas Cathedral of Russian Orthodox Church in N. Am. v Kedroff, 302 NY 1, 29 [1950].) By asserting authority over the temporal and religious affairs of St. Matthew, NEDA and Bishop Creech may have been legitimately motivated by concern for the affairs of St. Matthew. Their involvement in the daily operations of St. Matthew, its property, and the determination of its pastor without the permission of either its trustees or its congregation, however, is precisely the sort of activity which the Religious Corporations Law was designed to protect against. Accordingly, the defendants are enjoined from any further interference with the administration of St. Matthew Church of Christ, its property and daily affairs.
Trespass and Treble Damages:
Plaintiff also has a cause of action seeking recovery of the property, attorney’s fees and court costs for trespass as well as treble damages for improperly detaining the real property. On the action of trespass, this court declines to hold that the defendants intentionally trespassed upon the plaintiffs real property. It is true that the Court of Appeals has held that “ ‘the trespasser, to be liable, need not intend or expect the damaging consequence of his intrusion, he must intend the act which amounts to or produces the unlawful invasion, and the intrusion must at least be the immediate or inevitable consequence of what he willfully does, or which he does so negligently as to amount to willfulness.’ ” (Ivancic v Olmstead, 66 NY2d 349, 352 [1985], quoting Phillips v Sun Oil Co., 307 NY 328, 331 *858 [1954].) However, while Bishop Creech and NEDA clearly intended to enter and become involved with the operations of St. Matthew, the trial testimony suggests that the defendants did so because they believed they were invited by some of the congregants and that their bylaws and constitution allowed them to do so.
In Long Is. Gynecological Servs. v Murphy, the Appellate Division, Second Department, stated that “[1] lability for civil trespass requires the factfinder to consider whether the person, without justification or permission, either intentionally entered upon another’s property, or, if entry was permitted, that the person refused ‘to leave after permission to remain ha[d] been withdrawn’” (298 AD2d 504, 504 [2002], quoting Rager v McCloskey, 305 NY 75, 79 [1953]). Bishop Creech received letters from some congregants voicing their displeasure with Phair’s leadership and seeking intervention. Such an invitation indicates that Bishop Creech and NEDA may have had some justification for entering the premises, particularly when St. Matthew did not have any bylaws or legitimately elected trustees. Moreover, in Zimmerman v Carmack, the Appellate Division states that “[t]he essence of trespass is the invasion of a person’s interest in the exclusive possession of the land” (292 AD2d 601, 602 [2d Dept 2002] [citation omitted]). Here, Phair was in possession of the real property on behalf of St. Matthew Church for its congregants; since the congregants all had access to the church, possession can hardly be characterized as exclusive. Accordingly, due to the ambiguities surrounding the control of St. Matthew and its property, this court cannot declare Bishop Creech or NEDA to be trespassers.
Plaintiff has also failed to meet the elements of detainer. Real Property Actions and Proceedings Law § 853 states that in order to receive treble damages for detainer, the defendants must have forcibly ejected the plaintiff from the property “by putting him in fear of personal violence.” While the plaintiff testified that defendants were disrespectful to her, there is no evidence that Phair was forcibly ejected by being put in fear of personal violence. Thus, plaintiff has not met the requisite elements of trespass or detainer and is not entitled to treble damages. The demand for costs and attorney’s fees is also denied.
Conclusion
A receiver shall be appointed to determine who is a member in good standing of St. Matthew Church of Christ as of April 1, *859 2000, according to the attendance roll book, customs, and traditions of the church and therefore eligible to vote in church elections for trustees. The receiver shall oversee a church vote for trustees thereby setting the rules and regulations for the campaign process and for proper notice of the elections to be given to the congregation in accordance with sections 194 through 199 of the Religious Corporations Law and the election. Furthermore, Bishop Creech and NEDA are enjoined from interfering with the church elections and the daily operation of St. Matthew. The expense of the receiver shall be equally divided between the plaintiff and defendants.

. Phair received her evangelical certificate from the Manhattan Bible Institute, was ordained and received an evangelical license from the Northeastern District Assembly (NEDA).

. Academic scholars have also suggested that the national Disciples of Christ organization is not a hierarchical organization since: “[a]lthough still firmly congregational, the Disciples now participate in a national denominational structure similar to that of the UCC (United Church of Christ), with a general assembly and a General Secretary providing coordination. The relationship of this leadership * * * is sometimes described as ‘covenantal,’ without the formal hierarchical structure characteristic of, for example, the Methodists and Presbyterians.” (Peter W. Williams, America’s Religions Traditions and Cultures, at 348 [MacMillan Publishing Co. 1990].)

. 2A NY Jur 2d, Agency and Independent Contractors § 82 notes that a special agent “cannot bind the principle in a matter beyond or outside the specific acts which the agent is authorized to perform on behalf of the principal.”