[879 NE2d 1282, 849 NYS2d 463]

In the Matter of CONGREGATION YETEV LEV D'SATMAR, INC., et al., Appellants, v JACOB (JENO) (YAAKOV) KAHANA et al., Respondents.

CONGREGATION YETEV LEV D'SATMAR, INC., et al., Appellants, v 26 ADAR N.B. CORP. et al., Respondents.

Argued October 16, 2007; decided November 20, 2007

## POINTS OF COUNSEL

*Kirkpatrick & Lockhart Preston Gates Ellis LLP,* New York City (*Gerald A. Novack* and *Walter P. Loughlin* of counsel), *Smith, Buss & Jacobs, LLP,* Yonkers (*Jeffrey D. Buss* of counsel), and *Thacher Proffitt & Wood LLP,* White Plains (*Kevin J. Plunkett* of counsel), for appellants. I. Respondents' election is a nullity because it was held in violation of the governing bylaw provisions. (*Kuehne & Nagel v Baiden,* 36 NY2d 539; *Sealey v American Socy. of Hypertension, Inc.,* 10 Misc 3d 572; *Ehrlich v American Moninger Greenhouse Mfg. Corp.,* 26 NY2d 255; *Matter of Venigalla v Alagappan,* 307 AD2d 1041; *Matter of Sousa v New York State Council Knights of Columbus Found.,* 10 NY2d 68.) II. There is no First Amendment bar to nullifying respondents' election. (*Watson v Jones,* 13 Wall [80 US] 679; *Presbyterian Church in U. S. v Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 US 440; *Jones v Wolf,* 443 US 595; *Morris v Scribner,* 69 NY2d 418; *Park Slope Jewish Ctr. v Congregation B'nai Jacob,* 90 NY2d 517; *Matter of Kaminsky,* 251 App Div 132; *Karageorgious v Laoudis,* 271 AD2d 653; *Matter of Venigalla v Alagappan,* 307 AD2d 1041; *Sillah v Tanvir,* 18 AD3d 223; *Trustees of Diocese of Albany v Trinity Episcopal Church of Gloversville,* 250 AD2d 282.) III. A holding of nonjusticiability would require the entry of a judgment recognizing the authority of the board elected in the first election. (*Matter of Empire State Supreme Lodge of Degree of Honor,* 118 App Div 616.)

*Herrick, Feinstein LLP,* New York City (*Scott E. Mollen* and *Paul Rubin* of counsel), for respondents. I. The First Amendment to the United States Constitution requires a civil court to refrain from resolving Congregation Yetev Lev D'Satmar, Inc.'s election controversy. (*Serbian Eastern Orthodox Diocese for United States & Canada v Milivojevich,* 426 US 696; *Kedroff v Saint Nicholas Cathedral of Russian Orthodox Church of North*

*America,* 344 US 94; *Kreshik v Saint Nicholas Cathedral of Russian Orthodox Church of North America,* 363 US 190; *Presbyterian Church in U. S. v Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 US 440; *First Presbyt. Church of Schenectady v United Presbyt. Church in U.S. of Am.,* 62 NY2d 110; *Waller v Howell,* 20 Misc 236; *Jones v Wolf,* 443 US 595; *Avitzur v Avitzur,* 58 NY2d 108, 464 US 817; *Park Slope Jewish Ctr. v Congregation B'nai Jacob,* 90 NY2d 517; *Matter of George v Holstein-Friesian Assn. of Am.,* 238 NY 513.) II. The Religious Corporations Law requires the trustees to respect the stated objectives of Congregation Yetev Lev D'Satmar, Inc. and the religious disciplinary rulings of its ecclesiastical leadership. (*Kroth v Congregation Chebra Ukadisha Bnai Israel Mikalwarie,* 105 Misc 2d 904; *Walker Mem. Baptist Church, Inc. v Saunders,* 285 NY 462; *Serbian Eastern Orthodox Diocese for United States & Canada v Milivojevich,* 426 US 696; *Waller v Howell,* 20 Misc 236; *Wall v Mount Calvary Baptist Church, Inc.,* 188 Misc 350.) III. Appellants are judicially estopped from claiming that this dispute should be decided by a civil court. (*Nestor v Britt,* 270 AD2d 192; *Atlas Drywall Corp. v District Council of N.Y. City & Vicinity of United Bhd. of Carpenters & Joiners of Am., Carpenters Local Union 531,* 207 AD2d 762.)

## OPINION OF THE COURT

PIGOTT, J.

The central issue in this appeal is whether resolution of an election controversy between two rival factions of a religious congregation can be achieved through the application of neutral principles of law without judicial intrusion into matters of religious doctrine. Like the trial court and Appellate Division, we conclude that it cannot.

Congregation Yetev Lev D'Satmar, Inc. is a community of Orthodox Judaism known as Satmar Hasidism located in Brooklyn. The Congregation was founded in 1948 by Grand Rabbi (also referred to as Rebbe) Joel Teitelbaum and formally incorporated in New York. In 1952, bylaws were promulgated setting forth the purpose of the Congregation, the functions of the Grand Rabbi, as well as issues involving membership in the community. The bylaws provided for a board of directors and officers to preside over the Congregation and, among other things, assure compliance with the rules of the Congregation.

In 1974, the Grand Rabbi expanded the Satmar community by establishing a new congregation in Monroe, New York. In

1981, that congregation, named for him, was incorporated in New York as Congregation Yetev Lev D'Satmar of Kiryas Joel, Inc.

In 1979, the Grand Rabbi died and was succeeded by his nephew, Moses Teitelbaum. Moses Teitelbaum, now deceased, appointed his elder son, Aaron Teitelbaum, Chief Rabbi of the Monroe Congregation and his younger son, Zalman Leib Teitelbaum, Chief Rabbi of the Brooklyn Congregation. Some time thereafter, a bitter feud erupted between Rabbi Aaron's supporters and Rabbi Zalman's supporters pertaining to who should succeed as Grand Rabbi.[1] As a result, the Brooklyn Congregation split into two rival factions.

Each faction conducted a separate election of the board of directors and officers for the Brooklyn Congregation. The first election, which took place on May 12-13, 2001, resulted in the election of petitioners, with Berl Friedman as president. The second, which took place the same day and is claimed to have been certified by the Grand Rabbi Moses Teitelbaum himself on May 24, 2001, resulted in the election of respondents, with Jacob (Jeno, Jenoe) Kahan as president.

Petitioners brought the instant proceeding pursuant to Not-For-Profit Corporation Law § 618 seeking an order declaring that the respondents' election is null and void and directing that Congregation property be transferred to Berl Friedman. Petitioners claimed that their election resulted in certain members of the Congregation becoming duly elected officers, including Berl Friedman; that respondents illegally attempted to "remove" these duly elected officers and expel Berl Friedman from membership; and that respondents' election violated the bylaws and/or the Religious Corporations Law. Respondents challenged the jurisdiction of Supreme Court, arguing that it should refrain from interfering in the internal affairs of the Congregation; and further contended that their election was proper, legal and in accordance with the Congregation's prior practice and bylaws. Respondents disputed petitioners' election, arguing it was a sham election for several reasons, including that Berl Friedman had been expelled from the Congregation by the Grand Rabbi.

Supreme Court declined to make a determination as to the validity of respondents' election, holding that it could not decide

---

1. Respondents contend that Moses Teitelbaum designated his younger son, Rabbi Zalman, to be his successor as Grand Rabbi upon his death.

the election dispute through the application of neutral principles of law because the resolution of the issues would require it to apply ecclesiastical doctrine in violation of the First Amendment. The Appellate Division, with one Justice dissenting, agreed with Supreme Court that "resolution of the parties' dispute would necessarily involve impermissible inquiries into religious doctrine and the Congregation's membership requirements" (31 AD3d 541, 543 [2d Dept 2006]). The Appellate Division subsequently granted leave and certified the following question to us: "Was the decision and order of this court dated July 11, 2006, properly made?" We now affirm.

The First Amendment forbids civil courts from interfering in or determining religious disputes, because there is substantial danger that the state will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrines or beliefs (*see Serbian Eastern Orthodox Diocese for United States and Canada v Milivojevich*, 426 US 696 [1976]). Civil disputes involving religious parties or institutions may be adjudicated without offending the First Amendment as long as neutral principles of law are the basis for their resolution (*see First Presbyt. Church of Schenectady v United Presbyt. Church in U.S. of Am.*, 62 NY2d 110 [1984]; *Park Slope Jewish Ctr. v Congregation B'nai Jacob*, 90 NY2d 517, 521 [1997], citing *Jones v Wolf*, 443 US 595 [1979]). The "neutral principles of law" approach requires the court to apply objective, well-established principles of secular law to the issues (*First Presbyt. Church*, 62 NY2d at 119-120). In doing so, courts may rely upon internal documents, such as a congregation's bylaws, but only if those documents do not require interpretation of ecclesiastical doctrine. Thus, judicial involvement is permitted when the case can be "decided solely upon the application of neutral principles of . . . law, without reference to any religious principle" (*Avitzur v Avitzur*, 58 NY2d 108, 115 [1983]).

Petitioners argue that this case involves nothing more than notice, quorum or other technical challenges to the respondents' election. At first blush, the arguments raised by the petitioners in their appellate brief to this Court,[2] do not appear to implicate ecclesiastical issues. Indeed, courts have properly adjudicated

---

**2.** Notably, petitioners' initial complaints found in their petition and considered by Supreme Court regarding the inadequacies of respondents' election were different from those now raised to this Court. Specifically, petitioners argued that the proxies and mail-in ballots were wrongly counted, members

disputes involving religious elections on neutral principles of law. For example, in *Rector, Churchwardens & Vestrymen of Church of Holy Trinity v Melish* (3 NY2d 476 [1957]), after determining that the quorum rules of the Religious Corporations Law, by their terms, did not apply to an Episcopalian church's election of a rector, we held that two meetings held by the church complied with applicable quorum requirements of a church canon. The Appellate Divisions have resolved similar disputes (*see Matter of Kaminsky*, 251 App Div 132 [4th Dept 1937], *affd* 277 NY 524 [1938]; *Sillah v Tanvir*, 18 AD3d 223 [1st Dept 2005], *lv denied* 5 NY3d 711 [2005]; *but see Mays v Burrell*, 124 AD2d 714 [2d Dept 1986]). These cases were resolved under neutral principles of law pursuant to the court's power to adjudicate under the Religious Corporations Law and/or the Not-For-Profit Corporation Law (*see e.g.* N-PCL 618, 706). In each of those cases, the courts resolved the election dispute by applying those laws as well as the bylaws or rules of the religious organization.

Here, however, as both Supreme Court and the Appellate Division recognized, the dispute between the two factions involves issues beyond mere notice and quorum challenges, such as whether Berl Friedman had been removed or expelled from the Congregation. Respondents claim that Jacob (Jeno, Jenoe) Kahan succeeded Berl Friedman as president and thus Jacob (Jeno, Jenoe) Kahan had the authority to conduct respondents' election. Specifically, respondents claim that Grand Rabbi Moses Teitelbaum denounced Berl Friedman and another member of his faction for rebelling against the authority of the Grand Rabbi and the Grand Rabbi's son, resulting in their expulsion from the Congregation. Berl Friedman denies being removed from the Congregation and further argues that an elected corporate officer cannot be removed by a spiritual authority such as the Grand Rabbi, which respondents refute.

It is well settled that membership issues such as those that are at the core of this case are an ecclesiastical matter (*Park Slope Jewish Ctr. v Stern*, 128 AD2d 847 [2d Dept 1987], *appeal*

of the Congregation Kiryas Joel, Monsey and Spring Valley were "disenfranchised" from voting in the election, members were wrongly prohibited from casting write-in votes, and the election was "packed" by new "members" and others unqualified to vote. Petitioners on appeal to this Court attempt to recast the issues, focusing on challenges concerning notice, quorum and resolution requirements found in the Religious Corporations Law in a futile attempt to make this case justiciable.

*dismissed* 70 NY2d 746 [1987]; *Matter of Kissel v Russian Orthodox Greek Catholic Holy Trinity Church of Yonkers*, 103 AD2d 830 [2d Dept 1984]). A decision as to whether or not a member is in good standing is binding on the courts when examining the standards of membership requires intrusion into constitutionally protected ecclesiastical matters. Although courts generally have jurisdiction to determine whether a congregation has adhered to its own bylaws in making determinations as to the membership status of individual congregants, here, the Congregation's bylaws condition membership on religious criteria, including whether a congregant follows the "ways of the Torah." Whether Berl Friedman was expelled from membership of the Congregation inevitably calls into question religious issues beyond any membership criteria found in the Congregation's bylaws (*Park Slope Jewish Ctr.*, 128 AD2d 847 [1987]; *Kissel*, 103 AD2d 830 [1984]).

Contrary to petitioners' position, Berl Friedman's religious standing within the Congregation is essential to resolution of this election dispute. Petitioners ask this Court not only to determine the validity of the respondents' election but also to recognize that petitioners, including Berl Friedman, are elected officers and the authorized governing body of the Congregation. With such membership issues at the center of this election dispute, matters of an ecclesiastical nature are clearly at issue. These particular issues must be resolved by the members of the Congregation, and cannot be determined by this Court.

Accordingly, the Appellate Division order should be affirmed with costs and the certified question not answered upon the ground that it is unnecessary.

SMITH, J. (dissenting). The majority is of course correct in saying that courts of our state, like other state and federal courts, are forbidden from deciding religious questions. This rule, as applied to disputes over ecclesiastical property, is usually a rule of deference: Civil courts defer to the decisions of religious tribunals, unless the case can be decided on the basis of neutral (i.e., nonreligious) principles. But in cases like this one, there is no religious tribunal to defer to, and the rule becomes one of justiciability; the majority here does not accept the decision of a religious tribunal as binding, but simply refuses to decide the case at all. Such a refusal is a drastic measure, because when a case is nonjusticiable it means the wrong committed, if there is one, cannot be remedied anywhere.

Whichever side happens to be the defendant in the case will win.

I believe that courts should hold disputes between religious factions to be nonjusticiable only as a last resort, where it is absolutely clear that no neutral principle can decide the case. I do not think that is true here, and I therefore dissent from the majority's finding of nonjusticiability and would reach the merits. On the merits, I would reject the claim that Berl Friedman and his allies are the duly elected officers of the Brooklyn Congregation, and would remit the case for Supreme Court to decide whether Jacob (Jeno, Jenoe) Kahan and his allies were validly elected, or whether there must be a new election.

I

The rule that civil courts may not decide ecclesiastical questions has its origin in *Watson v Jones* (13 Wall [80 US] 679 [1872]), in which the United States Supreme Court decided that the right to use property claimed by contesting factions of a local Presbyterian church must be resolved not by the courts, but by the highest decision-making authority of the Presbyterian Church in the United States. Though the decision was not based on the Constitution, it was based on fundamental principles of religious freedom and state neutrality toward religion:

> "In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." (*Id.* at 728.)

*Watson* made clear that its holding applied only to hierarchical organizations like the Presbyterian Church—"large and influential bodies," each having "a body of constitutional and ecclesiastical law of its own" (*id.* at 729). The Court said:

> "[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Id.* at 727.)

The *Watson* Court distinguished the case of a hierarchical church from the case of "a church of a strictly congregational or independent organization, governed solely within itself" (*id.* at 724). For congregational churches, *Watson* did not pronounce a rule of deference, but said: "where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations" (*id.* at 725). In applying to congregational churches the rules governing voluntary associations, there could be "no inquiry into the existing religious opinions of those who comprise the legal or regular organization" (*id.* at 725).

The rule of *Watson* was recognized in the twentieth century as having a constitutional basis, and was followed in a series of Supreme Court cases, among them *Kedroff v Saint Nicholas Cathedral of Russian Orthodox Church of North America* (344 US 94 [1952]); *Presbyterian Church in U. S. v Mary Elizabeth Blue Hull Memorial Presbyterian Church* (393 US 440 [1969]); and *Serbian Eastern Orthodox Diocese for United States and Canada v Milivojevich* (426 US 696 [1976]). These cases seemed to stand for the proposition that a civil court must always defer to the authoritative decision-making bodies of hierarchical churches, but in *Jones v Wolf* (443 US 595 [1979]), the Court held that states could decide religious property disputes in civil courts if they did so according to "neutral principles of law" (*id.* at 602-603). The Court in *Jones v Wolf* restated the constitutional rule established by several of its earlier cases: "[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice" (*id.* at 602).

In *First Presbyt. Church of Schenectady v United Presbyt. Church in U.S. of Am.* (62 NY2d 110, 121 [1984]), we adopted the "neutral principles" approach, describing it as "preferable to deference." We also held in *First Presbyterian*, however, that we were "constitutionally foreclosed" from resolving doctrinal issues, including issues of church government (*id.* at 124).

All the cases cited so far in this opinion involved hierarchical churches. They established that civil courts may decide church property disputes based on "neutral principles" where they can, but must defer to ecclesiastical authorities when neutral principles will not resolve the case. The problem of how to deal with disputes within congregational religious bodies is harder, and has received less attention. Deference often is not possible,

for there is no tribunal of the church hierarchy to defer to. Neutral principles seem the only available option—but what if, as sometimes happens, neutral principles cannot resolve the case? The Supreme Court has said that there are cases in which adjudicating a property dispute "would require the civil court to resolve a religious controversy" (*Jones v Wolf*, 443 US at 604)—but it said in the same case that civil courts may not do so.

When the dilemma is insoluble, the only remedy is the one the majority adopts here—to dismiss the case as nonjusticiable. This is not the first case in which it has been done (*see e.g. Congregation Beth Yitzhok v Briskman*, 566 F Supp 555, 557-558 [ED NY 1983]), though I think it is the first in which we have done it, and there is no case in which the United States Supreme Court has endorsed that remedy. It is a remedy that should if possible be avoided.

Nonjusticiability implies that the party having the burden of proof loses; thus it is ordinarily a "defendant wins" rule. It will inevitably produce arbitrary and inconsistent, and sometimes perverse or unjust, results. Here, for example, the Kahan faction is the defendant, and therefore wins, because the status quo is in its favor—it is in de facto control of the Brooklyn Congregation. But if members of the Friedman faction had somehow succeeded in occupying the Congregation's offices, and the Kahan faction sued to evict them, presumably the majority would say the case is still nonjusticiable and the Friedman faction, being the defendant, would win. Or suppose both factions claimed the corporation's bank account and the bank, not knowing whose checks to honor, brought an interpleader action. Would the majority say that the interpleader action is nonjusticiable—leaving the bank account frozen indefinitely?

It is to avoid problems like these, I think, that courts try hard to find, and usually succeed in finding, neutral principles to resolve disputes where deference is not an option. In *Park Slope Jewish Ctr. v Congregation B'nai Jacob* (90 NY2d 517 [1997]), we held that a dispute arising from a schism within a congregation could be resolved by neutral principles, reversing a ruling that it was nonjusticiable. Lower New York courts have removed the management of religious bodies, and ordered new elections under court supervision, without deciding any religious issue (*see e.g. St. Matthew Church of Christ, Disciples of Christ v Creech*, 196 Misc 2d 843 [Sup Ct 2003]). And in a copyright infringement dispute involving a prayer book, where the defendant argued that the court lacked jurisdiction because the case

turned on the validity of a rabbinical court ruling, the Court of Appeals for the Second Circuit concluded that, while defendant's argument had "some force," it must be rejected because of the harm that would flow from a holding of nonjusticiability: "we cannot decline jurisdiction on this basis; to do so would permit any party to contend that religious doctrine that it deems authoritative undermines the authority of its adversary's position" (*Merkos L'Inyonei Chinuch, Inc. v Otsar Sifrei Lubavitch, Inc.*, 312 F3d 94, 100 [2d Cir 2002]).

For similar reasons, I approach this case with a strong reluctance to decline jurisdiction, and I conclude that the case can be decided on neutral principles.

## II

Before turning to neutral principles, however, I consider the possibility that deference *is* an option in this case—that the approach of *Watson v Jones* and later cases involving hierarchical religious bodies can be applied here. It can be argued—indeed, the Kahan faction seems to argue, and Supreme Court may have found—that the Brooklyn Congregation, however unlike the Catholic or Presbyterian church in its structure, is hierarchical in the relevant sense, because there is a single decision-making body whose authority all adherents have agreed to accept: the Grand Rabbi. The Kahan faction submits a document, which it says was signed by the Grand Rabbi, certifying that the Kahan faction nominees were validly elected. This, the Kahan faction says, ends the matter. I do not think the case can be resolved so easily.

First, as I read the parties' contentions, the Friedman faction disputes the authenticity of the document and of the Grand Rabbi's signature on it. But putting that aside, the Friedman faction disputes the Grand Rabbi's authority to decide the validity of a congregational election; it acknowledges the Grand Rabbi's supreme authority in spiritual matters, but claims that he has "no secular authority," and that the validity of the election is a secular question. Central to this argument is article 8 of the bylaws, which speaks of the first Grand Rabbi, Joel Teitelbaum, in terms that the parties agree apply to his successor, Moses Teitelbaum:

> "The most revered teacher, Rabbi Yoel Teitelbaum, may he live long and be well, is our local rabbi, may it be for many years to come. Nobody can perform

his functions without his consent. He is the only authority in all spiritual matters. No rabbi, ritual slaughterer or teacher can be chosen without his consent. His decision is binding on every member."

This may mean that all of the Grand Rabbi's decisions bind every member, or only that they bind every member "in all spiritual matters." The language seems ambiguous to me, and I do not think the ambiguity can be resolved without deciding a religious question—the scope of a religious leader's authority over his followers. Indeed, it is one of the ironies of this case that Supreme Court based its finding of nonjusticiability on its interpretation of this bylaw; I think the issue of what the bylaw means is itself nonjusticiable.

### III

The Friedman faction makes essentially two claims: that its candidates are the validly elected leaders of the Brooklyn Congregation, and that the candidates of the Kahan faction are not. I conclude, applying neutral principles, that we can readily resolve the first of these claims: The Friedman faction has wholly failed to establish that its candidates were validly elected. The question as to whether the election of the Kahan faction's candidates was valid, I conclude, raises issues of fact that should be resolved by Supreme Court.

### A

The basis for the Friedman faction's claim to control the Brooklyn Congregation is an election held in early May 2001, pursuant to a resolution passed at what the Friedman faction says was a meeting of the Congregation's board of trustees on January 14, 2001. The Kahan faction says that the Friedman faction's election was irregular in many ways, and the Friedman faction makes no specific response. Indeed, the Friedman faction does not explain its basis for asserting that the people who met on January 14 were members of the Congregation's board, and there is considerable reason to doubt the validity of that board meeting. Friedman asserted in an affirmation submitted to Supreme Court that the meeting was attended by "83 board members"—but Religious Corporations Law § 207 provides for a maximum of 72 trustees, and various versions of the Congregation's bylaws provide for varying numbers, none more than 52.

Without defending the lawfulness of its candidates' election, the Friedman faction says they must be installed in office

because no timely challenge to that election was brought. This argument fails; that is not the way the Not-For-Profit Corporation Law works.

Section 618 of the Not-For-Profit Corporation Law provides for a proceeding by "any member aggrieved by an election," but the failure to bring such a proceeding does not mean that any activity called an "election" by its participants becomes binding. Section 618 provides a means of removing from power people who may not have been lawfully elected—not a means of installing claimants who say they have been. On the Friedman faction's theory, any group of people could hold what they called an "election" for officers of any not-for-profit corporation; wait four months for the statute of limitations to run (see CPLR 217); and, if no section 618 proceeding was brought, march in and take over the corporation. This is an absurd result, and the Friedman faction cites no authority supporting it. No examination of religious doctrine is needed to reject this aspect of the Friedman faction's case.

B

The Friedman faction's challenge to the validity of the election on which the Kahan faction relies, an election allegedly authorized at a board meeting held January 18, 2001, presents a harder issue. The Friedman faction says this election is invalid on several grounds. One is that it was called by a board from which Berl Friedman had, allegedly improperly, been excluded. The Kahan faction claims that Friedman was removed by the Grand Rabbi. I have already said that I regard the extent of the Grand Rabbi's authority as a religious question, and I therefore agree with the majority that, if the Grand Rabbi did in fact remove Friedman, a challenge to the election based on his lack of authority to do so would not be justiciable. The Friedman faction, however, challenges not only the Grand Rabbi's authority to remove Friedman, but the factual claim that he did so. I agree with Justice Spolzino, dissenting below, that it "requires no inquiry into religious doctrine to ascertain whether the Grand Rebbe said and did what he is purported to have said and done" (31 AD3d 541, 546 [2d Dept 2006]). This issue, at least, can be resolved on neutral principles.

There are other issues that can be so resolved. The Friedman faction's challenge to the election is not based on Friedman's exclusion alone. The Friedman faction disputes whether the January 18 board meeting ever occurred, whether it was called

on proper notice and whether a quorum was present. It questions whether the resolution calling the election was actually passed. It claims that procedures in the election violated the Religious Corporations Law and the Congregation's bylaws, specifying alleged flaws relating to proxies, mail-in ballots and write-in votes. It claims that some members were excluded from voting, and some nonmembers permitted to vote.

All these issues, except perhaps the ones relating to membership, can be resolved without examination of any religious issues. The majority points out that some issues relating to membership may be religious, and therefore nonjusticiable. I agree that a civil court may not examine any assertion that a potential voter in the election did or did not follow the "ways of the Torah." But it does not appear to me from the record that the Friedman faction makes any such assertion. It does raise other issues, including the important one of whether members of the Satmar congregation at Kiryas Joel are also members of the Brooklyn Congregation, a question that should be answerable on neutral principles.

In short, while some nonjusticiable issues may come up in the course of the case, it is not impossible for a civil court to decide the case as a whole, and because it is not impossible I think it should be done. I recognize that, if we were to reach the result I favor, we would be imposing a significant burden on the Kings County Supreme Court, where Justice Barasch and his colleagues have already struggled mightily with this dispute, showing remarkable patience and devotion to duty. This is an enormously difficult case, involving as it does a bitter battle between two factions whose differences are extremely hard for outsiders to understand. It has produced, as Justice Barasch tells us in an epilogue to his opinion, attempts by people claiming allegiance to one faction or the other "to discredit, intimidate and improperly influence" the Supreme Court, with the result "that there are judges who would prefer to decline any assignment involving members of this group of litigants" (5 Misc 3d 1023[A], 2004 NY Slip Op 51515[U], *13, *14). I join Justice Barasch—as, I am sure, do all my colleagues—in saying that this behavior is intolerable, and in expressing the hope that the proper authorities will deal with it.

Despite all this, I would ask Supreme Court to take up this case again, and decide the merits. This would, perhaps, illustrate the rule that no good deed goes unpunished, but I think it would serve a more valuable purpose also. Courts are sometimes most

necessary when the parties to a dispute are at their most passionate and irrational. In such cases, the prospect of the parties resolving their differences in court may be unattractive, but the thought of their resolving them elsewhere may be less attractive still. I therefore think that courts should, where they possibly can do so, accept jurisdiction in cases like this, and I dissent from the majority's decision to decline jurisdiction here.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO and READ concur with Judge PIGOTT; Judge SMITH dissents in a separate opinion; Judge JONES taking no part.

Order affirmed, etc.