In the Matter of the Application of STEVE KAMINSKY, a Member of St. John's Greek Catholic Church of Syracuse, New York, to Take Proof of Elections, etc., Pursuant to the Provisions of Section 25 of the General Corporation Law.

HARRY HNATKO and Others, Composing the Membership of a Board of Trustees of St. John's Greek Catholic Church of Syracuse, New York, Appellants; STEVE KAMINSKY and MICHAEL PUCHAR and Others, as Trustees of St. John's Greek Catholic . Church of Syracuse, New York, Respondents.

Fourth Department, May 12, 1937.

*William H. Bamerick,* for the appellants.

*Clifford H. Searl,* for the respondents.

EDGCOMB, J. This proceeding is brought pursuant to the provisions of section 25 of the General Corporation Law, to determine which of two rival boards of trustees of the Ruthenian Greek Catholic Church of Syracuse, if either, has been legally elected.

The record is voluminous, and covers many different transactions, but our task will be made comparatively easy if we keep constantly in mind the sole problem which we are called upon to solve, and refrain from an attempt to settle other matters of dispute which have arisen between the warring factions of the church.

In order to properly determine the issue it will, however, be helpful, if not necessary, to briefly review the history of this particular church, and its relation to the parent body.

The Ruthenian Greek Catholic Church belongs to that branch of Catholic Christians which follows the teachings, doctrines, practices, usages and rites of the Greek Catholic Church in Galicia. It is one of the Uniate churches which has a separate organization, but which is in full communion with the Holy See, and which acknowledges the spiritual supremacy of the Roman Pontiff. It retains all the privileges, immunities and practices of the ancient Eastern or Byzantine rite, not inconsistent with the fundamental christian faith of the Western or Latin Church. It uses the Byzantine liturgy. The bishops are appointed by the Pope, and the priests of the various churches are designated by the bishops. The services are conducted in the Slavonic rather than the Latin language.

The general scheme of government of each individual church of the denomination is similar to that of the Roman Catholic Church. The business of the individual church is vested in a board of trustees consisting of the bishop, the chancellor of the diocese, and the priest of the particular congregation, all of whom are *ex officio* members of the board, and two lay members selected by said officials, or by a majority of them. A close unity is thus preserved between the ecclesiastical and temporal affairs of the church. Prior to 1917, when article 5-A was added to the Religious Corporations Law, there was no provision in this State for the incorporation of a Ruthenian Greek Catholic Church under such a plan. If it was desired to incorporate such an organized body, it was necessary to resort to the provisions of the act applicable to Roman Catholic and Greek Churches, or to that portion of the statute which now constitutes article 10, and which puts the temporal affairs of the organization in the hands of a board of lay trustees elected by the members of the church.

The church in question was incorporated in 1900 under the name of St. John's Greek Catholic Society of Syracuse, New York, under the latter provisions of the Religious Corporations Law. Its membership is made up largely of men and women of foreign birth, most of whom are unable to speak, read or write the English language, and all of whom are unacquainted with the intricacies of corporate existence.

From the very outset of the organization dissension arose among the members, and one group arrayed itself against the other. The feeling at times ran high; it would then die down, only to be fanned into flames again on the slightest occasion. We are told that these people are deeply religious, but their meetings were turbulent and disorderly. They failed to heed the admonition of St. Paul to the church at Corinth, when he said: " Let all things be done decently and in order." (1 Corinthians, 14:40.) Their business meetings were opened by prayer, but ended in such confusion and uproar that the police were often called in to restore order. It may well be said that the members belong to the church militant, rather than the church triumphant.

The warring factions have not hesitated to resort to the courts in an effort to enforce what they claim to be their legal rights, and the money of these comparatively poor people, which should have gone to the support of the Gospel, has been diverted to pay the cost of expensive litigation.

In line with the general policy of the parent church, and on the advice of the then American bishop, a new certificate of incorporation was filed in the Onondaga county clerk's office on June 2,

1913, incorporating the St. John the Baptist Ruthenian Greek Catholic Church, to take care of and manage the temporal affairs of the Ruthenian Greek Church in the parish of Syracuse, and vesting the government and management of the corporation in a board of trustees of five, which should be composed of the bishop of the church in America, the vicar general, the priest in charge of the parish, and two lay members to be chosen annually at an election at which all male members of the congregation in good standing should be entitled to vote, and which members thus chosen should be approved by the bishop. The property of the church, however, was never turned over to the new corporation. Title has remained in the 1900 corporation.

From 1913 until 1932 the 1900 corporation practically ceased to function. No trustees or officers were elected, and the corporation was allowed to sleep. The secular pursuits of the organization were taken over by the 1913 corporation, and the two lay trustees called for by that charter were annually elected. The religious services of the church and all its spiritual affairs have constantly been under the supervision and direction of the various priests who have been assigned by the Ruthenian Greek Catholic bishop since that prelate was first sent to the United States in 1907.

In 1932 the trouble in the church broke out anew, and an attempt was made by the insurgent group to revive the 1900 corporation, and to elect the six trustees called for by its by-laws. This effort was opposed by the priest and the group in sympathy with him. Two groups of six each claim to be the legally elected trustees of that organization; one, the insurgent faction, composed of Michael Puchar, Nicholas Spak, Mike Schrab, Peter Fecyk, Peter Rischak and Wasyl Kyrek, and the other, the regulars, composed of Harry Hnatko, Philip Kutlick, Elisa Kopko, Paul Kamenetzka, Panko Macko and Peter Weyshshin. We are asked to pass upon the legality of the various elections under which these men claim to hold office, and to confirm the election of one group or the other, if that can properly be done, and if not, to order a new election.

Upon the return of the order to show cause a referee was appointed " to hear, try and report to this court which of the alleged trustees of St. John's Greek Catholic Church of Syracuse, New York, have been duly elected * * *, or, in the alternative, as to whether a new election should be ordered." The referee has found that none of the claimants were legally chosen, and that a new election should be had. The trial court has disapproved this conclusion, and has confirmed the election of the insurgent group headed by Michael Puchar.

Section 25 of the General Corporation Law, under which the court derives its power to act in the present proceeding, reads as follows: " Upon the application of any member aggrieved by an election, and upon notice to the persons declared elected thereat, the corporation and such other persons as the court may direct, the Supreme Court at a Special Term thereof shall forthwith hear the proofs and allegations of the parties, and confirm the election or order a new election, as justice may require."

While the statute confers ample authority upon the court to determine any question relating to the election of trustees, including such as are merely incidental thereto, if necessarily involved in the controversy, the proceeding is summary in its nature, and does not permit the decision of equitable claims, or extraneous matters not necessarily involved in the determination of the primary question itself. (Matter of Utica Fire Alarm Telegraph Co., 115 App. Div. 821, 826, 827; Matter of Supreme Council of Catholic Relief & Beneficiary Assn., 142 id. 307, 312.)

The trial court has held that the 1913 corporation never had a valid existence. That may be so, but a corporation may exist in fact without being legally constituted. Here the church has acted under this particular charter for upwards of fifteen years, and no one questioned its legality until shortly before these proceedings were instituted. During this period the priest, assuming to function under the new certificate, exercised control over the real and personal property of the church, and succeeded in paying off all the obligations of the society, including a mortgage of $30,000, the proceeds of which were used to build the new edifice. Whether the 1913 organization was a corporation de jure or de facto is not before us. Its corporate existence cannot be questioned by a parishoner in a summary proceeding of this character. That right rests solely with the Attorney-General. (Harosym v. St. John's Greek Catholic Church, etc., 239 App. Div. 563; Buffalo & Allegany R. R. Co. v. Cary, 26 N. Y. 75, 78.)

Before examining the procedure which was followed at the various meetings which we are called upon to review, reference should be had to the legal requisites which entitle one to vote at such meeting, and to the procedure necessary to call such a meeting.

Section 194 of the Religious Corporations Law prescribes the notice to be given for the annual meeting of the corporation. It is there said: " The trustees shall cause notice of the time and place of its annual corporate meeting, therein specifying the names of any trustees, whose successors are to be elected thereat, * * * to be given at a regular meeting of the church for public worship, at morning service, if such service be held, on each of the two successive

Sundays next preceding such meeting, * * *. Such notice shall be given by the minister of the church, if there be one, or if not, by the officiating minister thereof, if there be one, or if not, or if any such minister refuse to give such notice, by any officer of such church."

The necessity for such a notice is to give to those entitled to vote, and who are interested in the affairs of the body, an opportunity to be present, and to have a voice in the management of the organization. Failure to comply with the requirements of the statute and the by-laws constitutes a ground for vacating the election. (*Matter of Keller*, 116 App. Div. 58; *Smith* v. *Erb*, 4 Gill [Md.], 437; *First African M. E. Zion Church* v. *Hillery*, 51 Cal. 155.)

Now as to what is necessary to enable one to vote at an annual meeting. Those qualifications are set forth in the statute and in the by-laws of the corporation.

Section 195 of the Religious Corporations Law reads as follows: " At a corporate meeting of an incorporated church to which this article is applicable the following persons, and no others, shall be qualified voters, to wit: All persons of full age, who are then members in good and regular standing of such church by admission into full communion or membership therewith in accordance with the rules and regulations thereof, and of the governing ecclesiastical body, if any, of the denomination or order to which the church belongs, or who have been stated attendants on divine worship in such church and have regularly contributed to the financial support thereof during the year next preceding such meeting."

The corporation itself, by section 1 of article IV of its by-laws, has limited the right to vote at an annual meeting. It is there said: " Only male members above the age of twenty-one years, in good standing, and who have contributed at least the sum of six dollars, if a single man, and ten dollars, if a married man, toward the support and maintenance of the church proper, during the last twelve preceding months, not including the usual missionary, or Sunday, or Festival day collections during religious service, shall have the right to vote at any meeting."

A church has a right to determine the qualifications for membership, and whether one is a member in good standing is a matter of an ecclesiastical nature, relating to the government and discipline of the church, and its decision is binding on the courts. (*Westminster Presbyterian Church* v. *Trustees of Presbytery of New York*, 142 App. Div. 855; appeal dismissed, 202 N. Y. 581; *Den* v. *Pilling*, 24 N. J. L. 653.)

The by-laws of the corporation provide that a member shall sever his connection with the church by his failure to pay his

dues for one year, or to attend religious services and mass for six months without a good excuse, or by neglecting, for a period of six months, to make confession and partake of the Holy Sacrament at the altar.

With these rules in mind, attention should now be directed to the evidence relating to the alleged election of the rival boards of trustees. It is claimed by one faction or the other that elections were had at four different meetings, viz.: One held on February 21, 1932, at which it is asserted that Michael Puchar, Nicholas Spak, Mike Schrab, Peter Fecyk, Peter Rischak and Hric Hnatko were elected; one held December 18, 1933, at which it is claimed that these same men, with the exception of Hric Hnatko, were re-elected, and at which it is said that Wasyl Kyrek was elected in the place of Hric Hnatko; one held January 29, 1934, at which it is declared that Harry Hnatko, Philip Kutlick, Elisa Kopko, Paul Kamenetzka, Panko Macko and Peter Weyshshin were chosen, and one held February 5, 1934, at which a resolution was adopted that Peter Rischak and Wasyl Kyrek be " named and appointed to act as trustees, and to hold office for one year, in place of Peter Rischak and Wasyl Kyrek, whose term has just expired." The referee has found that all of these meetings were illegal, and that no valid election took place on any of these occasions. The trial court has reached a different conclusion, except as to the meeting of January 29, 1934. He holds that the elections of February 21, 1932, December 18, 1933, and February 5, 1934, were legal, and should be confirmed. That would elect the insurgent ticket, headed by Michael Puchar.

The preponderance of the evidence sustained the conclusion of the referee that all of these elections were illegal. It is unnecessary to go into the details of these various meetings. To do so would unduly lengthen this opinion. The irregularities can only be referred to generally.

No notice of the February 21, 1932, meeting was given as prescribed by statute. That was a meeting called for the election of two trustees of the 1913 corporation. The insurgents gained control of the meeting, and proceeded to elect six trustees of the 1900 corporation. While the notice for the 1933 meeting called for the election of six trustees of the 1900 corporation, it was never read by the priest from the pulpit. Puchar says that he read it on the two Sundays preceding the date of the meeting, after the morning service. The statute requires that it be read at a regular meeting of the church for public worship. That provision was not complied with.

At all these meetings men were allowed to vote who were not members of the church in good standing — men who had not paid their dues, who had failed to contribute toward the support of the church during the preceding twelve months, who had failed to regularly attend divine services on Sunday, and who had neglected to perform their Easter duty. At some of these elections men were not allowed to enter the room where the meeting was being held. At all of these assemblages disorder, confusion and turmoil prevailed. It cannot be said that these were fair elections.

Furthermore, none of the six insurgents, who have been seated by the order appealed from, were eligible to hold the office of trustee. The trustees of the corporation must be members thereof. Section 195 of the Religious Corporations Law provides that the trustees " shall be elected from the qualified voters." A person is not a member in good standing, according to the by-laws of this particular corporation, if he has failed to pay his dues, or to attend religious services and mass, without a good excuse, for six months, or has neglected for a period of six months to go to confession, and partake of the Holy Sacrament. The insurgent trustees have failed to live up to these requirements; they were not members in good standing, and consequently were ineligible to serve as trustees of the corporation. They cannot excuse their failure to support the church, or to attend divine service, because the bishop and the priest chose to treat the original organization as a nullity, and to act under the 1913 charter. Back in 1910 the 1900 corporation had, by resolution, subjected itself to the jurisdiction of the parent church, and the various priests who have ministered to the spiritual welfare of the congregation have since that date been appointed by the Greek Catholic bishop of America. Every member of the church owed the bishop and the priest his loyal support in ecclesiastical and spiritual matters. The insurgent trustees cannot hope to uphold their title to office in spite of their failure to comply with the requirements for membership in the church, upon the plea that the title to the church property is in the 1900 corporation — an independent body and a free lance — and that by reason thereof they owe no allegiance to the body now in control of the ecclesiastical affairs of the church.

This is a summary proceeding. The statute gives the court discretionary power to confirm an election, or to order a new one, " as justice may require." Concededly the court may not arbitrarily refuse to ratify an election which has clearly been shown to be legal and fair, and order a new one, if perchance the result is unsatisfactory. On the other hand, if reasonable grounds exist

to indicate that the election under review has not been conducted in a proper, regular or fair manner, it should not be confirmed. If the result is not free from suspicion, or is clouded in doubt, and justice demands, we may in all fairness require the parties to start over again. When right, justice and fair play require, a new election should be ordered. (*Matter of Bogart*, 215 App. Div. 45.)

It is unfortunate that the factional strife which has existed in this church for these many years cannot be brought to an end. Its continuation will benefit no one, and can only result in eventual ruin and disaster to the church. It would seem to an outsider that these differences could be adjusted, if each faction would approach the matter in the spirit of Him whom they profess to serve. This, however, is a matter beyond the jurisdiction of the court.

While the limit of our power under the statute is to pass upon the validity of an election already had, and while we have no authority to supervise one to be held in the future (*Matter of Washington Ave. Baptist Church*, 215 App. Div. 529), a word of caution concerning the election which we are about to order may not be out of place. The conduct of corporate meetings is prescribed by section 195 of the Religious Corporations Law. The mandates of the statute are definite and positive, and must be scrupulously observed, or else the result will be of little or no avail. The attorneys for the respective parties should, and doubtless will, strongly advise a strict adherence to the prescribed requirements. If the election is conducted in an orderly and proper manner, and under the supervision of properly chosen and accredited inspectors, and if every member of the church in good standing is given ample opportunity to vote, and if the result is honestly counted and recorded, it will, in our opinion, go far toward healing the differences now existing in the organization. The members must, and doubtless do, recognize that in this country of their adoption the majority must rule, and if the result announced is clearly the will of such majority, the minority can have no just cause for complaint.

It is quite probable that to successfully adjust the differences which have arisen between the members of this congregation, and to bring the secular and ecclesiastical affairs of the church in closer touch, certain changes will be found necessary in the corporate structure of the church. That is a matter which must be worked out by those interested, and cannot be determined in this proceeding.

For the reason stated, it follows that the order appealed from should be reversed, and that an order should be granted refusing to confirm the election of any of the persons claiming to have been chosen as trustees of the St. John's Greek Catholic Church,

and that, in the interest of justice, a new election should be had on the 21st day of June, 1937, at the church hall located at the corner of South Wilbur avenue and Tompkins street in the city of Syracuse, N. Y., at eight o'clock p. m., and that notice of the time and place of such meeting should be given at a regular meeting of the church for public worship, at morning service, on each of the two successive Sundays next preceding such meeting by the priest of the church, or in his absence by the officiating minister thereof, and by conspicuously posting a written copy thereof in the English language, and a translation thereof in the Ukrainian language, in the entry way of the outer entrance to the principal place of worship of such church at least two weeks prior to the holding of such meeting.

All concur; THOMPSON, J., having been present at the argument of said appeal, but having died on the 7th day of April, 1937, without having taken any part in the determination of this appeal. Present — SEARS, P. J., EDGCOMB, CROSBY and CUNNINGHAM, JJ.

Order reversed on the facts, with costs, and order granted setting aside all elections involved in this proceeding and ordering a new election of trustees. Certain findings of fact and conclusions of law disapproved and reversed and new findings of fact and conclusions made.