[996 NYS2d 236]

In the Matter of MING TUNG et al., Respondents, v CHINA BUD-
DHIST ASSOCIATION et al., Appellants.

First Department, November 13, 2014

### APPEARANCES OF COUNSEL

*Capell Barnett Matalon & Schoenfeld*, Jericho (*Joseph Milano* of counsel); *Todd L. Platek*, Flushing; and *Benjamin L. Herzweig*, Patchogue, for appellants.

*Alexander P. Kelly*, Brooklyn, for respondents.

### OPINION OF THE COURT

GISCHE, J.

This is a CPLR article 78 proceeding brought by a monk

(Master Tung), a nun (Wai Ching Chen), and a lay person (Shun Yi Mon), who were members of the China Buddhist Association (CBA) until they were excommunicated from the CBA. Respondents are the CBA, Master Mew Fung Chen (Master Chen), the original founder and spiritual leader of the CBA who performed the excommunication, and two trustees (Ming Yee and Chih Chen Ma) he recently appointed in 2011. The petition seeks a judgment directing the CBA to hold an annual membership meeting, as required by CBA's bylaws, the appointment of a receiver to determine the names and addresses of all CBA members eligible to vote, and a vote regarding the CBA's future. Supreme Court (Geoffrey Wright, J.) granted the petition to the extent of invalidating a May 2011* meeting and election held by the CBA and ordering that a duly convened meeting be held in the future. The order specifically requires that petitioners be notified of that meeting so they can participate. Petitioners' ultimate goal is to vote for the division of the CBA into two separate religious corporations, each with legal ownership of its own, completely independent, temple.

Respondents have appealed, arguing that the petition should be dismissed because the relief sought by petitioners cannot be decided through the application of neutral principles of law, and that by invalidating the May 2011 meeting and election, and directing that petitioners be permitted to participate in a future CBA meeting, the court interfered with religious matters which are constitutionally protected. In particular, respondents argue that because only CBA members can attend and vote at meetings, the court cannot provide the relief sought without necessarily determining the validity of the excommunications, which is a purely ecclesiastical matter. We reverse the Supreme Court's grant of the petition because the issues raised are not secular in nature, but religious, and cannot be resolved by the application of neutral principles of law.

The CBA was incorporated in October 1963 by Master Chen. Before its incorporation, the CBA existed as an unincorporated Buddhist society. Thereafter, in 1970, the CBA applied for, and was granted, an exemption from federal income tax as a religious organization (Internal Revenue Code [26 USC] § 501 [c] [3]). Eventually, the CBA acquired real property, including property at 245 Canal Street, New York, New York (Manhattan

* Though referring to the "May 2011" meeting, this is apparently a shorthand reference by the court below, and even in the briefs, to a number of actions taken by the CBA around that time, including a meeting.

temple), and in Flushing, New York (Queens temple), where it established temples. The Queens temple is the corporate headquarters of the CBA. The deeds to these and other real properties are titled in the name of the CBA. Petitioners worshiped at the Manhattan temple until they were excommunicated and it was closed.

The first meeting of the CBA was held in January 1964. At that meeting, the incorporators selected officers and adopted bylaws. Master Chen was made the CBA's president and Chairman of the Board of Trustees, consisting of three trustees, Master Chen included. Article two of the bylaws provides that the CBA was organized for the following purposes:

> "1. To foster and promote the teachings of Buddhism. 2. To maintain a house of worship for all those who wish to learn and practice the Buddhist religion. 3. [T]o conduct Buddhist religious services. 4. To foster fellowship among its members and with members of other Buddhist and religious groups."

Although the bylaws provide for officers to serve fixed terms of three years, and annual elections to be held each January, this was the first and only meeting and election ever held by the CBA until the meeting in May 2011. Now age 86, Master Chen is the sole surviving original corporate officer.

Article three of the bylaws provides that "[m]embership in this organization shall be open to all who are of the Buddhist faith and have been admitted as disciples." None of the corporate governance documents, including the bylaws, otherwise specifies any procedure by which someone becomes a member, clergy person, or disciple of the CBA, nor do any of these documents specify how a member, clergy person, or disciple of the CBA is excommunicated, stripped of his or her membership, or denied privileges in the CBA, including the right to worship at any CBA-owned temple. Article four of the bylaws pertains to meetings and who may attend, stating that notice of the annual meeting will be mailed to "every member in good standing." The bylaws also permit the president to call a special meeting, if he deems it "[in] the best interest of the organization." Article five provides that "any question may be voted upon in the manner and style provided for election of officers and directors." The election of officers and directors requires a marked ballot. Article seven addresses votes by the trustees, vacancies and removal of officers and article eight broadly provides that the CBA's president has "such powers as

may be reasonably construed as belonging to the chief executive of any organization." Article eleven provides for the payment of dues in the annual sum of $10.00.

In 1996, Master Chen, on behalf of the CBA, offered Master Tung employment as a monk and sponsored his application for an immigration visa. Among Master Tung's duties were teaching new members the manners of worship, praying, chanting, worshiping, preaching and conducting Buddhist ceremonies. In 1998, Master Chen presented Master Tung with a letter of appointment, appointing him a resident monk of the CBA, exhorting Master Tung to "spread the trust of Buddhism."

The relationship among the congregants of the CBA was harmonious until sometime in 2009 when a power struggle developed. The Manhattan temple contingent views Master Tung as their spiritual leader and believes that the Manhattan temple should be autonomous. Master Chen, however, regards Master Tung as a rogue monk who has shown a lapse in faith, promoted disharmony within the CBA, disobeyed his (Master Chen's) authority, strayed from the path of righteousness and engaged in wayward behavior contrary to Buddhist tenets. This struggle has, at times, escalated into violence, necessitating police intervention, and there have been protests at the Manhattan temple, which have attracted media attention.

By letter dated September 23, 2010, Master Chen severed his "master-apprentice relationship" with Master Tung and notified him that he was to leave the Manhattan temple immediately, never to return to that, or any other, temple associated with the CBA. According to Master Chen, he took such actions to prevent this "spiritual pollution" from spreading to the CBA's other temples. After designating two trustees to fill vacancies on the board, the board met in April 2011 to address the September 2010 events. They resolved that it was in CBA's best interest to excommunicate petitioners and close the Manhattan temple. Subsequently, by notice dated May 16, 2011, in which he refers to his "ultimate and ecclesiastical authority over all activities in these three temples," Master Chen stripped the Manhattan disciples (petitioners) "of their blessing," effectively excommunicating them. The excommunication and petitioners' termination from employment was later ratified by the board of trustees in June 2011. Although petitioners are forbidden from worshiping at any CBA-owned temple, they may worship at any non-CBA temple available to them.

In invalidating the May 2011 meeting, the Supreme Court found that the bylaws make no reference to excommunication

and stated that "I note further, that no particular lapse of faith to justify the excommunication was given" (2012 NY Slip Op 33698[U], *3 [2012]). The court below also stated that "[r]espondents have no real active interest in the [Manhattan temple and] it is my hope that the two sides will, with the guidance of their faith, find a way to co-exist, at least until the membership meeting is held" (id. at *4).

The Establishment Clause of the First Amendment of the United States Constitution, which is binding on the states by the Fourteenth Amendment, guarantees religious bodies "independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine" (Kedroff v Saint Nicholas Cathedral of Russian Orthodox Church in North America, 344 US 94, 116 [1952]). Consequently, courts are forbidden from "interfering in or determining religious disputes, because there is substantial danger that the state will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrines or beliefs" (Matter of Congregation Yetev Lev D'Satmar, Inc. v Kahana, 9 NY3d 282, 286 [2007] [citation omitted]). Only when disputes can be resolved by neutral principles of law may the courts step in (see First Presbyt. Church of Schenectady v United Presbyt. Church in U.S. of Am., 62 NY2d 110, 116-117 [1984], cert denied 469 US 1037 [1984]). The issues before us, however, cannot be resolved through the application of "neutral principles of law" but entail an inquiry into the validity of petitioners' excommunications. Because this is an entirely ecclesiastical matter, we are forbidden from such an inquiry (Congregation Yetev Lev D'Satmar, 9 NY3d at 286).

The neutral principles of law approach allows the court to apply principles of law to disputes, even if a religious body is involved. In doing so, the court can examine internal organizational documents, like the bylaws, which may apply to or shed light on the dispute, as well as the Religious Corporations Law. Where disputes concern real property, the court can also look to the deeds to resolve the issues before it (First Presbyt. Church of Schenectady, 62 NY2d at 121-123). The deeds for these temples provide no support for petitioners' claims, however, because title to the real property, including the temples involved, is held by the CBA. Petitioners can only achieve their ultimate objective by legally separating the two factions via a successful membership vote approving such measure. However, neither

the bylaws, nor the Religious Corporations Law, provide petitioners with any right to vote at a CBA meeting. CBA's bylaws permit CBA members to vote and membership in the CBA is conditioned on being of the Buddhist faith and admission as a disciple. It is undisputed that Master Chen acted within his spiritual authority when he originally accepted petitioners as his disciples and unilaterally named Master Tung the resident monk of the Manhattan temple. The bylaws place no express or implied restrictions on whom Master Chen can choose to make a member of the CBA, or whom he can expel from membership. It is unrefuted that membership is a prerequisite to becoming a member of the clergy.

At first blush the petition appears to present a straightforward issue of corporate governance, specifically whether various corporate actions, including a meeting held in May 2011, were improperly taken, thereby depriving petitioners of their right to participate in those events. We take no issue with petitioners' claim and the dissent's conclusion that the CBA has not followed corporate formalities which may impact on whether the parliamentary acts undertaken by it are valid. We hold, however, that because petitioners are not members of the CBA based upon Master Chen's excommunication of them, they cannot challenge these corporate actions. Article four of the bylaws limits attendance at annual and special meetings by providing that notices of the annual meeting must be sent to "every member in good standing" and special meetings are open to "members." Since petitioners were excommunicated from the CBA in September 2010, and they were no longer members when these various parliamentary actions were taken, they had no right to be notified of, or participate in, the meetings held or votes taken. Petitioners contend that their excommunication was completely motivated by Master Chen's desire to squelch the simmering underlying dispute over ownership of real property in Manhattan and Queens where the CBA owns temples. Even where the parties' dispute concerns control of church property, the court will not intervene in matters that are predominantly religious disagreements (*Serbian Eastern Orthodox Diocese for United States and Canada v Milivojevich*, 426 US 696 [1976]).

It is impermissible for a court to look behind an ecclesiastical determination or act to examine the subjective reasons for which it was undertaken (*Congregation Yetev Lev D'Satmar*, 9 NY3d at 286; *Upstate N.Y. Synod of Evangelical Lutheran Church in*

*Am. v Christ Evangelical Lutheran Church of Buffalo*, 185 AD2d 693, 694 [4th Dept 1992], citing *Serbian Eastern Orthodox Diocese v Milivojevich*, 426 US at 721-722).

Although a court may determine whether a religious organization has adhered to its membership requirements by examining corporate documents, such as the bylaws, here the bylaws are unhelpful because they are silent on that issue. Membership is solely conditioned on discipleship and it is unrefuted that Master Chen has always made that determination, even in the case of petitioners. Whether petitioners' excommunication and expulsion from the CBA was justified calls into question religious dogma, practices and issues well beyond any membership criteria found in CBA's bylaws which do not provide any procedure for or limitation on how a member is expelled or excommunicated from the CBA.

We find that the reasoning and holding of the Court of Appeals in the strikingly similar recent case of *Congregation Yetev Lev D'Satmar* compels our conclusion. As in the proceeding before us, *Congregation Yetev Lev D'Satmar* involved an election controversy between two rival factions of a religious congregation. Central to that controversy was whether a particular member had been properly expelled from the congregation by the Grand Rabbi, making him unqualified to vote on matters of the congregation's corporate governance. In concluding that the dispute could not be decided through application of neutral principles of law, the Court observed that "[a] decision as to whether or not a member is in good standing is binding on the courts when examining the standards of membership requires intrusion into constitutionally protected ecclesiastical matters" (*Congregation Yetev Lev D'Satmar*, 9 NY3d at 288). Noting that the congregation's bylaws "condition membership on religious criteria, including whether a congregant follows the 'ways of the Torah'," the Court found that whether the member was properly expelled "calls into question religious issues beyond any membership criteria found in the Congregation's bylaws" (*id*).

In this proceeding, petitioners' claims are likewise nonjusticiable, as they cannot be resolved based on neutral principles of law, but involve an impermissible inquiry into religious doctrine or practice (*id*. at 286-287; *see Sieger v Union of Orthodox Rabbis of U.S. & Can.*, 1 AD3d 180, 182 [1st Dept 2003]). Here, membership in the CBA requires being of the Buddhist faith and admission as a disciple. There are no governance provisions

for becoming a disciple or for reversal of that process, clearly making this an entirely discretionary matter vested in its leader and premised on religious, not secular, principles (*Congregation Yetev Lev D'Satmar*, 9 NY3d at 288).

Respondents' subsequent decision to elect officers and hold a meeting ratifying Master Chen's excommunication of petitioners does not mean that secular rules and legal principles apply to resolve the parties' disputes. Nor does it mean that the respondents, by having engaged in various parliamentary acts, have opted for a secular basis by which to excommunicate members. Consequently, the motion court erred in directing a new meeting on the basis that the meeting held by the CBA in May 2011 was improperly called.

The dissent maintains that petitioners have standing as members to challenge the actions taken in May 2011, because they meet the alternative definition of "members" in Religious Corporations Law § 195, which is based upon attendance and financial contribution. Petitioners, however, did not assert that claim in their petition, or raise it in the underlying motion, or make that argument in their responsive briefs before this court. We believe that we cannot decide whether Religious Corporations Law § 195 has any application to this proceeding when the parties were not given a full and fair opportunity to argue the issue. Moreover, the affidavits of some CBA members other than petitioners who state that they regularly worship at the Manhattan temple and contribute to the CBA do not, on their face, establish a predicate for the application of Religious Corporations Law § 195; it is the petitioners who must qualify as members to have standing. In any event, the statements are conclusory, tracking the statutory language, but without any factual support.

We also disagree with the dissent that this matter is distinguishable from the issues considered by the Court of Appeals in *Congregation Yetev Lev D'Satmar* because the CBA is not part of a larger hierarchical body with a well organized and centralized governing body, or there is no established tradition for the dismissal of a Buddhist monk, much less, the closure of a Buddhist temple. Constitutional protections to practice one's religion are not limited by the manner of its organization or structure (*see Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Commn. of City of N.Y.*, 55 NY2d 512, 521-523 [1982]). We also disagree with the dissent's conclusion that we should adjudicate the issue of whether a lone monk can

exercise authoritarian control over the property of a religious corporation. To consider whether a spiritual leader wields too much power or authority over his congregants, in the absence of corporate restrictions on such power, places the court in the position of evaluating ecclesiastical doctrine, law, practices, procedures and rulings (*see Presbyterian Church in U. S. v Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 US 440, 447 [1969]; *see also Park Slope Jewish Ctr. v Congregation B'nai Jacob*, 90 NY2d 517, 521 [1997]). We cannot consider whether one master or faction is better suited or more correct for the CBA than another (*First Presbyt. Church of Schenectady*, 62 NY2d at 117). To do so would be to enter a "forbidden [domain]" (*id.* at 116). Although we recognize that there may be ongoing turmoil within the CBA, regardless of the parties' underlying motivations, those disputes cannot be resolved through the application of neutral legal principles and petitioners have no right to the relief demanded.

Accordingly, the order of the Supreme Court, New York County (Geoffrey D. Wright, J.), entered May 31, 2012, which granted the petition to the extent of invalidating the China Buddhist Association's May 2011 meeting and directed that another general meeting be held with petitioners included should be reversed, on the law, without costs, the order vacated, and the petition dismissed.

Tom, J.P. (dissenting). This case presents the straightforward issue of whether a religious corporation can be required to observe prescribed corporate procedures, including complying with its own bylaws, holding membership meetings and electing a board of trustees.

Because a special meeting was called by unauthorized trustees in violation of the corporate bylaws and notice was not given to all congregants qualified to vote, the actions taken at that meeting and asserted to have been ratified by the purported trustees are null and void. Therefore, a new meeting is required. Under Religious Corporations Law § 195, membership in the particular religious organization is immaterial to the issue of whether someone who is a congregant or attendant at worship and a regular financial contributor, has the right to vote at a corporate meeting. Thus, whether individual congregants are "members" of the religious community and whether its spiritual leader has the authority to expel or "excommunicate" them do not affect their right to vote in a corporate meeting under section 195.

The majority gives the impression that the instant litigation involves merely three disgruntled petitioners who are a monk, a nun and a congregant (who may be a member) of the China Buddhist Association (CBA or association). While only three individuals are listed as petitioners, it should be noted that the instant petition seeks, inter alia, to enforce the right of all members or congregants expelled to establish their qualification to vote at a new membership meeting at which trustees of the association can be legally elected. Respondent Mew Fung Chen (Master Chen) excommunicated not only the three petitioners but a total of 517 members, representing all the congregants of the Manhattan chapter of the CBA and a majority of the CBA's members, 10 days before the special meeting called by the two unauthorized trustees appointed by Master Chen. Thus, he deprived the Manhattan congregants of their right to vote on the agenda of the meeting which, in effect, resulted in the transfer of control of all properties and assets of the CBA to Master Chen. Only 110 members of the Queens faction of the CBA, all supporters of Master Chen, were given notice of the special meeting. Attached to the petition are affidavits of various Manhattan congregants who set forth their entitlement to cast a vote but were not given notice of the May 2011 meeting. Irrespective of the expulsion of the majority of the association's membership or the propriety of that action—whether examined against the tenets of Buddhist religious tradition or the teachings of the organization's spiritual leader—the corporation remains the secular owner of the association's properties. Any disagreement concerning the control and disposition of corporate assets must be resolved in the manner required by the Religious Corporations Law and the association's bylaws. Since the contested expulsions have no effect on either the organization's statutory obligation to hold a valid meeting to elect officers and directors and conduct church business or on those persons entitled to vote at that meeting, Supreme Court properly granted the petition to the extent of vacating the actions taken at the special meeting called in violation of the association's bylaws and directing that a new general meeting be scheduled.

The CBA filed a certificate of incorporation under the Religious Corporations Law on October 3, 1963. It was approved as a tax exempt organization under section 501 (c) (3) of the Internal Revenue Code (26 USC), and was issued an exempt organization certificate by the New York State Department of Taxation and Finance in July 1971. The petition states that the

CBA owns and maintains two temples within New York City, a retreat house in Hyde Park, New York and, upon information and belief, at least two other commercial properties in Manhattan.

This controversy arises out of a dispute between petitioners, two of whom identify themselves as resident clergy and one as a long-term member of the congregation of the Fa Wang temple located at 245 Canal Street (the Manhattan temple), which opened in 1964, and the leadership of the Ci Hang temple located at 136-12 39th Avenue in Flushing (the Queens temple), where religious services have been conducted since 1994. The Queens temple is controlled by respondent Master Chen, the CBA's founder, who is described by respondents as its "Grand Master" and "highest religious authority." The congregation of the Manhattan temple, which is effectively controlled and operated by petitioners and their followers, is the significantly larger of the two and is presided over by petitioner Ming Tung (Master Tung), who was hired by the CBA in 1996 and appointed by Master Chen to serve as "resident monk."

Since the months following its inception, the CBA has failed to conduct its operations as required by law and its own bylaws. At the CBA's initial membership meeting on January 2, 1964—the only membership meeting ever held—corporate officers and a board of trustees were elected, including Master Chen as president of the association and chairman of the board of trustees. Among the bylaws adopted at the meeting, article four provides for an annual membership meeting to be held on January 2 of each year, with regular membership meetings in April, July, and October, and for such "special meetings" as might be called for by the president "when he deems it for the best interest of the organization." Alternatively, a special meeting may be called upon the written request of two members of the board of trustees or 20 members of the organization.

Article seven of the bylaws provides for the board of trustees to consist of three people, who are to be elected by the membership for three-year terms and "shall have the control and management of the affairs and business of this organization." Midterm vacancies are to be filled by a vote of the remaining trustees, but only for the balance of the year. Of the three original trustees, Master Chen is the only survivor. Article eight provides for three corporate officers—the president, treasurer, and secretary—of whom the president "shall by virtue of his office be Chairman of the Board of . . . Trustees." A secretary is

to be selected by the trustees "from one of their number." The term of the officers is not prescribed. As to the membership, article three of the bylaws provides: "Membership in this organization shall be open to all who are of the Buddhist faith and have been admitted as disciples."

From the end of 2009 to late 2010, the relationship between the Manhattan and Queens factions of the CBA deteriorated rapidly. While the exact reasons are undisclosed in the record, the growing schism between the two groups is attributed to increasing animosity between the presiding monks of the respective temples. According to petitioners, in 2009, Master Chen arranged for a lay volunteer and worshiper at the Queens temple by the name of Cheuk-Yiu Man to take over certain unspecified administrative duties at the Manhattan temple that formerly had been performed by Master Tung and the resident nuns. In October 2010, a monk unknown to the Manhattan clergy by the name of Xiao Dan Wu was moved into the residence and began a campaign of harassment and intimidation against the other resident clergy and the temple's worshipers. According to the affidavit of Ming Xin Shi, a resident nun, Xiao Dan Wu was escorted from the Manhattan temple by police after assaulting Master Tung, and fled the temple shortly thereafter. It is further alleged that Cheuk-Yiu Man physically attacked members of the Manhattan temple's congregation and its clergy. In November 2010, Master Chen caused a holdover proceeding to be commenced against Master Tung in an attempt to regain possession of his quarters at the Manhattan temple.

After these concerted efforts failed to drive out the resident clergy, Master Chen issued a flier, which was posted at the entrance to the Manhattan temple on May 16, 2011, purporting to direct its closure because it had "become contaminated and unclean" as the result of "iniquitous behavior of monks and nuns." In addition, the locks to the prayer hall located on the second floor were changed to prevent access. The flier further proclaimed: "I declare that all disciples of [the Manhattan] Temple are hereby stripped of their blessing. They are therefore no longer disciples of mine . . . or members of the [China Buddhist Association]."

In October 2011, petitioners obtained a temporary restraining order enjoining Master Chen and his agents from interfering with the regular payment of salary to the resident clergy and otherwise interfering with their ability to conduct religious activities at the Manhattan temple. Contemporaneously,

petitioners obtained a second temporary restraining order enjoining respondents from vandalizing or removing any property from the temple, including books and records, occupying the premises or entering them outside normal business hours. The summary holdover proceeding was ultimately dismissed because the supporting verification was signed by Cheuk-Yiu Man in his alleged capacity as "executive officer" of the CBA. Supreme Court found that the association's bylaws do not provide for any such position and that the verification was fatally defective.

The petition at issue was filed on September 2, 2011. It seeks, by way of order to show cause, an order (1) directing the CBA to hold an annual membership meeting pursuant to its bylaws; and (2) appointing a receiver for the CBA to determine who in the association is eligible to vote at such meeting. The petition further states that the CBA is an independent religious association that is not part of any larger ecclesiastic body or organization. It further states that Master Chen lacks authority to fire clergy or expel members of the CBA, that the bylaws contain no provisions for hiring and firing clergy and are likewise silent with respect to dismissing members of the CBA. The stated purpose of the annual membership meeting to be held is to take a vote on the dissolution of the CBA; alternatively, to vote on its division into two separate religious corporations to hold title to the two temples where religious services are regularly conducted; and to elect a board of trustees.

Respondents, in opposition, assert that the effect of Master Chen's pronouncement stripping all of the members of the Manhattan temple of his blessing was to "excommunicate any and all members of the CBA" who worshiped at that temple. They further assert that his decisions and actions in regard to closing the temple and expelling its membership and clergy "were duly adopted and ratified by the Board of Trustees of the CBA." In a supporting document denominated "Action of the Board of Trustees" that was "adopted as of January 1, 2011," Master Chen, purporting to act as the "sole surviving and remaining member of the Board of Trustees," designates Ming Yee and Yung Feng Yang to fill two vacancies on the board for the balance of the year. In a similar document dated April 22, 2011—several weeks before the posting of the notice on the Manhattan temple on May 16—the trustees resolved that "the Board of Directors is in agreement that it is in the best interests of China Buddhist Association to close [the Manhattan] Temple

and to excommunicate any and all alleged members of China Buddhist Association who pray at [the Manhattan] Temple." The submitted documents include a request for a special membership meeting to elect a Board of Trustees signed by the two interim trustees and dated May 12, 2011, written notice of a special membership meeting scheduled for May 26, 2011, an affidavit stating that the notice of election was served and a "certification of results of voting for Board of Trustees" indicating that the special meeting was held on May 26, 2011 and that the individual respondents were duly elected.[1]

Respondents argue that the decisions of Master Chen to excommunicate the members of the Manhattan Temple and to close the temple are "ecclesiastical and religious functions beyond review of the Court, and not subject to this Court's subject matter jurisdiction." Thus, they maintain, an article 78 proceeding is an inappropriate vehicle for resolving the parties' dispute, and this proceeding must be dismissed (citing *Matter of Congregation Yetev Lev D'Satmar, Inc. v Kahana*, 9 NY3d 282 [2007]).

Supreme Court found that the May 2011 meeting was held in violation of the articles of incorporation and bylaws and granted the petition to the extent of vacating actions taken at the meeting of the board of trustees, ostensibly ratifying the expulsion of the 517 congregants and the closing of their temple (2012 NY Slip Op 33698[U] [2012]). The court directed that another general meeting of the membership be scheduled for the purpose of electing trustees.

It is beyond question that while a court may not interfere in ecclesiastical matters, it has the power to decide whether applicable statutory requirements and the bylaws of the organization have been complied with in deciding whether an election was validly conducted (*Matter of Kaminsky*, 251 AD 132 [4th Dept 1937], *affd* 277 NY 524 [1938]).

It should be noted that the CBA is devoid of any corporate agents who possess authority to act on the organization's behalf. Whatever Master Chen's ecclesiastical rank—Master, Grand Master or Supreme Spiritual Leader—he is not an officer or trustee of the organization, his tenure having expired some 43

---

1. Respondents also maintain that relief pursuant to CPLR article 78 is unavailable due to petitioners' failure to first make a demand upon the association for such relief. Even assuming that such a demand would be anything but futile (*see Miller v Schreyer*, 257 AD2d 358 [1st Dept 1999]), there remains the obvious question of who would have been authorized to receive or act upon such request (*see id.* at 360).

years prior to the acts complained of by petitioners. Thus, he was without authority to appoint interim trustees, who were themselves without authority. Devoid of trustees, the only available means of calling a special meeting under the CBA's bylaws is by written request of 20 members of the association. Thus, it is clear that the May 2011 meetings called by the two purported interim trustees were not authorized by the association's bylaws and that the business conducted, particularly the decision to close the Manhattan temple, was without force and effect.[2] The particular defect in respondents' position, adopted by the majority, is that the expulsion of the congregants of the Manhattan temple as members of the CBA does not have the supposed effect of eliminating them as persons qualified to vote in a corporate election.

The qualification of voters at corporate meetings is specified by Religious Corporations Law § 195, which extends the right to vote to persons who meet either of two criteria. First, it extends to "persons who are then members in good and regular standing of such church by admission into full communion or membership therewith in accordance with the rules and regulations thereof, and of the governing ecclesiastical body, if any, of the denomination or order to which the church belongs" (*id.*). Additionally, it is conferred on those persons "who have been stated attendants on divine worship in such church and have regularly contributed to the financial support thereof during the year next preceding such meeting" (*id.*) Thus, a person is qualified to vote *either* as a member of the church or as an attendant at worship and contributor of financial support. An expelled member remains qualified to vote if he or she falls within the second category of qualified voters under section 195.

To restrict the right to vote only to those persons who qualify under the membership criterion requires further corporate action. The statute provides that a church may, at a duly noticed meeting, "determine that thereafter only members of such church shall be qualified voters at corporate meetings thereof" (*id.*). The CBA never adopted a provision requiring that only "members of such church" are qualified voters. Notably, the

---

**2.** As this Court observed in another context, a person who has incorporated a religious organization must assume the burdens imposed by the Religious Corporations Law along with its advantages (*see Avon Bard Co. v Aquarian Found.*, 260 AD2d 207, 212 [1st Dept 1999], *appeal dismissed* 93 NY2d 998 [1999]).

CBA never held a duly noticed meeting. Thus, under the statute, the qualified voters include not just members, but also those "persons . . . who have been stated attendants on divine worship . . . and have regularly contributed . . . financial support" to the CBA during the year preceding the meeting (*id.*; *see Sillah v Tanvir*, 18 AD3d 223, 224 [1st Dept 2005], *lv denied* 5 NY3d 711 [2005]; *Islamic Ctr. of Harrison v Islamic Science Found.*, 262 AD2d 362, 363 [2d Dept 1999], *lv denied* 94 NY2d 752 [1999]). Since the disputed action of shutting down the Manhattan temple and expelling all of its 517 members was purportedly adopted at a meeting on May 26, 2011, the pertinent year for the purpose of determining whether an attendant on divine worship contributed financial support is the year preceding that meeting date.

The majority states, without citation to authority, that because the association's bylaws provide for notice to be sent only to members in good standing and petitioners were not members, "they had no right to be notified of, or participate in, the meetings held or votes taken" (majority op at 19). It should be apparent that if the meeting was called in violation of the association's bylaws, it simply does not matter whether proper notice was given. Furthermore, Religious Corporations Law § 194 specifies how notice of a meeting must be given, and failing to comply with the statute affords an additional basis for vacating any business conducted at the meeting. In *Trustees of Gallilee Pentecostal Church, Inc. v Williams* (65 AD3d 1221, 1223 [2d Dept 2009]), involving the parallel notice provision of Religious Corporations Law § 164, the court voided the election of trustees at a membership meeting called without the requisite statutory notice (*see also Horodeckyi v Horodniak*, 16 Misc 2d 865 [Sup Ct, NY County 1958]; *Holcombe v Leavitt*, 124 NYS 980 [Sup Ct, Erie County 1910]; *cf. Feldbin v Temple Beth-El of Manhattan Beach*, 210 AD2d 374 [2d Dept 1994] [meeting to consider renewal of rabbi's contract exempted from statutory notice requirements by Religious Corporations Law § 25]).

The closing of a place of worship implicates the need to dispose of its property, over which church trustees are assigned custody and control (Religious Corporations Law § 5). In the absence of duly elected trustees, no action can be taken. It is apparent that the manner in which the unauthorized May 2011 meeting was called was calculated to preclude the participation of the 517 expelled congregants in the voting process, thereby resulting in the election of trustees amenable to promoting the

interests of Master Chen and his adherents in the disposition of the Manhattan temple.

The use to which church property should be applied involves temporal matters that can be decided by application of neutral principles of law and governing statutes. As to the prohibition against interference in religious matters, even assuming that the Manhattan temple has been dissolved by a superior ecclesiastical authority whose decision must be accorded deference (*see Watson v Jones*, 80 US 679, 727 [1871]), "there still remains the legal entity—that is to say, the trustees of the corporation are left in charge of its property, but without any spiritual body to maintain services or carry on religious work therein" (*Westminster Presbyt. Church of W. Twenty-Third St. v Trustees of Presbytery of N.Y.*, 211 NY 214, 223 [1914]). Since there are no trustees of the CBA to take charge of the affairs of the Manhattan temple, it is clear that the first requirement for resolving any dispute over the property held by and on behalf of the temple is the election of a board of trustees with the authority to determine its proper disposition.

The majority's reliance on *Congregation Yetev Lev D'Satmar* (9 NY3d 282 [2007]) in support of respondent's contention that this Court is without jurisdiction to entertain this dispute is misplaced. While membership in a religious order is a spiritual determination to which we are required to accord deference, the courts possess jurisdiction to decide whether the religious organization "adhered to its own bylaws in making determinations as to the membership status of individual congregants," and judicial review is only precluded where the "bylaws condition membership on religious criteria" (*id.* at 288). Since the CBA's bylaws do not condition the right to vote at corporate meetings on membership in the religious order, the issue of whether religious criteria for membership have been satisfied will not be encountered and does not, unlike the Satmar dispute, involve this court in matters of faith.

The distinction that respondents, and the majority, fail to recognize is that membership in the religious community, the dispositive issue in the Satmar dispute, is immaterial to the resolution of this appeal. This aspect is overlooked because it involves a matter that is not discussed by the Court of Appeals, that is, whether the right to hold elected office *requires* membership in the religious organization. Rather, analysis in *Congregation Yetev Lev D'Satmar* proceeds, without comment, on the presupposition that Berl Friedman, the respondent purportedly

expelled from the Satmar Congregation, could not hold the office of president unless he was a member of the religious community. Thus, the Court found it dispositive that "the Congregation's bylaws condition membership on religious criteria, including whether a congregant follows the 'ways of the Torah,' " concluding that the propriety of Friedman's expulsion "inevitably calls into question religious issues beyond any membership criteria found in the Congregation's bylaws" (*id.*).

Disregarded by the majority is that the question of membership in the CBA is not germain to the statutory right to vote in an election of trustees to preside over the affairs of the association. Unlike the matter before the Court of Appeals, we are not confronted with the question of whether the expulsion of a member of the congregation was proper because the CBA never adopted the requisite provision to restrict qualified voters to members of the association. Thus, a qualified voter includes any person who regularly attended worship and contributed to the financial support of the CBA, irrespective of whether the association has been dissolved or such person has been expelled from membership in the congregation. Since membership is not material, a determination of who has the right to vote does not involve this Court in consideration of "membership criteria found in the Congregation's bylaws" (*id.*). And if we need not examine the association's internal documents, we need not consider whether they "require interpretation of ecclesiastical doctrine" (*id.* at 286). In sum, because membership is not dispositive, we are not required, as the majority mistakenly asserts, to inquire into "religious dogma, practices and issues well beyond any membership criteria found in CBA's bylaws" by examining the decisions taken by Master Chen in expelling all the members of the Manhattan temple and directing its closure (majority op at 20).

Further, while our courts are precluded by virtue of the Establishment Clause of the First Amendment from interfering in any action taken in Master Chen's role as a spiritual leader, it should not require emphasis that the protection afforded by the Establishment Clause is a shield to prevent state promotion of one religion over another; it is not a sword to permit a religious leader to exercise totalitarian control over denominational assets in contravention of the system of corporate democracy mandated by the Religious Corporations Law. The purportedly ecclesiastical decision by the CBA's spiritual leader to expel the entire Manhattan congregation which represents the major-

ity of CBA's worshipers—announced shortly before the meeting at which persons purporting to act as CBA trustees voted to close the Manhattan temple and ratify the expulsion of its congregants—appears to be no more than a mere pretext intended to subvert the corporate process without any regard to religious doctrine. This is borne out by the fact that only supporters of Master Chen were given notice of the May 26, 2011 special meeting, while all 517 Manhattan congregants were expelled 10 days before the special meeting was held and were not given notice merely because they were not Chen supporters.

Reduced to its essentials, respondents' argument confronts us with the question of whether a single Zen monk, acting without legal corporate authority, can exercise authoritarian control over the property of a religious corporation through the expedient of expelling any and all of his opponents, thereby ruling as a majority of one. Thus, to the sound of one hand clapping, respondents would have this Court add the conundrum of the singular plurality. To accept their position that Master Chen's ostensibly ecclesiastical decision subjects corporate property to his exclusive personal control would relegate the Religious Corporations Law to the status of an easily obviated artifact (*see Westminster Presbyt. Church*, 211 NY at 224 ["A deed of land to a religious corporation is not worth much if it can thus readily be nullified"]), a result that hardly promotes legislative intent (*see Thoreson v Penthouse Intl.*, 179 AD2d 29, 33 [1st Dept 1992], *affd* 80 NY2d 490 [1992]; McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a]).

To adopt respondents' view would reward Master Chen for ignoring provisions of the Religious Corporations Law and the association's bylaws for 43 years and treating the CBA as his alter ego. It would also discard the distinction drawn between the spiritual and temporal aspects of a religious corporation. *Westminster Presbyt. Church* (211 NY 214) indicates that while a superior religious authority may expel the congregants of a church, it may not disenfranchise them or their elected representatives. There, the Court of Appeals held that a decree of dissolution issued by the church's governing body extends "no further than the ecclesiastical or spiritual side of the plaintiff's organization; for the Religious Corporations Law confers no power upon such a governing body, or anybody else, to dissolve a religious corporation" (*Westminster Presbyt. Church*, 211 NY at 223). It is the duty of the elected trustees of the church to "hold the property subject to denominational uses, notwith-

standing the dissolution of the spiritual church" (*id.*). Where, as here, there is no duly constituted board of trustees with authority to take possession and control of church property, the congregants must be afforded the opportunity to elect a board with the authority to protect the association's interests, provide for the orderly administration of the CBA's properties and "preserve them from exploitation by those who might divert them from true beneficiaries of the corporate trust" (*Morris v Scribner*, 69 NY2d 418, 423 [1987]).

Further, it appears that respondents' own practices indicate that the "agreement" of the board of trustees is necessary to effectuate Master Chen's pronouncements on matters such as excommunication and the closure of a temple. The trustees' agreement that the temple closure and excommunications were in the CBA's best interest, and the resolution that the excommunication ceremony should go forward and be binding, reasonably show that such ratification was required to effectuate the pronouncements of Master Chen. Notably, a similar deliberate approval is reflected in the June 9, 2011 ratification of the dismissal of the two Manhattan temple nuns. Once again, the elected trustees were without authority to act on behalf of the CBA, thus, invalidating such approval.

As set forth above, petitioners have standing to commence this proceeding. Respondents raised a number of pro forma challenges to petitioners' right to maintain this special proceeding by way of affirmative defense, none of which has been pursued on appeal. While the answering papers state that petitioners lack sufficiently cognizable stakes in the outcome, no such argument is advanced in appellants' brief. In any event, it is difficult to imagine persons more suited to bring the proceeding on behalf of the Manhattan disenfranchised members or congregants than the presiding monk in charge of the Manhattan temple, a resident nun and a worshiper at the Manhattan temple for over 40 years, all of whom occupied a position of importance in the religious community. The presiding monk Master Tung was in charge of the Manhattan temple and had been conducting the affairs and business of the temple for many years. Significantly, the unauthorized actions of the purported trustees in closing the Manhattan temple and expelling its congregants deprived the resident clergy of both their ministry and their residence, and the long-term congregant of her place of worship. Furthermore, Shun Yi Mon stands to lose her statutory right to participate in the election of trustees at a

duly scheduled meeting, an interest representative of all the expelled members. These consequences entail actual or threatened concrete injury affording petitioners with a sufficiently cognizable interest in the resolution of the dispute to ensure that it will be presented "in a form traditionally capable of judicial resolution" (*Schlesinger v Reservists Comm. to Stop the War*, 418 US 208, 220-221 [1974]; *see Community Bd. 7 of Borough of Manhattan v Schaffer*, 84 NY2d 148, 154-155 [1994]). Despite the obvious concrete injury demonstrated, the majority remarkably holds that petitioners are unable to challenge the concededly unauthorized acts taken by respondents, including the misappropriation of association property, or seek redress for the 517 excommunicated members who have a right to vote in an election to select association trustees.

As to the majority's position that petitioners have no right to relief under Religious Corporations Law § 195 because they have not specifically cited to that provision, it need only be noted that the courts of this state are required to "take judicial notice without request of the common law, constitutions and public statutes of the United States and of every state" (CPLR 4511 [a]). Nine affidavits submitted by expelled lay members of the association in support of the petition recite, in haec verba, "I have contributed regularly, and I regularly attend religious services to this day," tracking the language of section 195. While short of a specific statutory citation, this is undoubtedly a reference to the statute's particular provisions, specifically, "the alternative definition of members . . . based upon attendance and [worship]" (*Islamic Ctr. of Harrison*, 262 AD2d at 363). Thus, the right of petitioners and worshipers at the Manhattan temple to relief under Religious Corporations Law § 195 has been asserted from the outset, and its relevance to this dispute cannot be so readily cast aside. In declining to enforce a clearly applicable statutory provision to resolve this controversy, the majority permits Master Chen to profit from his utter disregard of law and the association's bylaws and abrogates the legal maxim that "there is no wrong without a remedy" (*People v Volunteer Rescue Army, Inc.*, 262 AD 237, 239 [2d Dept 1941]).

Accordingly, the order should be affirmed.

SWEENY, DEGRASSE and CLARK, JJ., concur with GISCHE, J.; TOM, J.P., dissents in a separate opinion.

Order, Supreme Court, New York County, entered May 31, 2012, reversed, on the law, without costs, the order vacated, and the petition dismissed.