OPINION OF THE COURT
Barbara Howe, J.
David Wolfenson died on November 2, 2005. David was the grantor of a trust, dated December 14, 1999, which was amended by him on June 29, 2001 (the first amendment to the David Wolfenson Living Trust), and which he amended again on July 1, 2002 (the second amendment to the David Wolfen-son Living Trust).[1]
Article THIRD of the trust provides that, if the net remaining assets are not effectively “appointed” by David on or before the date he dies, those assets are to be distributed: “equally among the class of individuals consisting solely of [David’s] great-grandchildren living at the time of [David’s] death, specifically the issue of [David’s] grandchildren WILLIAM STEWART FISCHBEIN, ALANA SUE FISCHBEIN a/k/a ALANA PAYNE and KELLEY INGER WOLFENSON, subject to the provisions of Article FOURTH” (emphasis added).
Article FOURTH of the trust, insofar as relevant here, provides as follows: “(A) The Trustees shall hold such property, IN FURTHER TRUST, for the benefit of my great-grandchildren living at the time of my death” (emphasis added). When David died in 2005, he had not appointed the net remaining trust assets, so that Articles THIRD and FOURTH control their disposition.
Pending now before me is a petition by Fidelity Personal Trust Company, FSB, as trustee of the trust, seeking two forms of relief. First, Fidelity asks that its accounts for the period January 1, 2012 through May 31, 2016 be judicially settled. Second, Fidelity seeks advice and direction from this court “confirming” that GG, David’s great-granddaughter[2]—who was born in 2006, five months after David’s death, but who was in útero when her great-grandfather died—is David’s surviving great-grandchild within the meaning and scope of Articles THIRD and FOURTH of the trust.
The guardian ad litem appointed by me to represent GG’s interests supports Fidelity’s petition for advice and direction. *364 However, Zoe Payne, William David Fischbein, and Nathan Fischbein (hereafter respondents)[3] contend that GG is not entitled to take under Articles THIRD and FOURTH of the trust. In opposing the advice and direction relief Fidelity seeks, and in cross-petitioning for a determination that GG is not a great-grandchild under Articles THIRD and FOURTH of the trust, respondents maintain that the phrase “living at the time of my death” was not intended to include a great-grandchild who was in útero at the time of David’s death, and they further allege that David would not have intended such a result.
Respondents have reserved their right to reply to the accounting aspects of Fidelity’s petition until after the advice and direction issue is resolved. Understandably, GG’s guardian ad litem has also not yet addressed that issue.
Respondents have now moved for summary judgment on the advice and direction application(s), and all parties have filed papers in that regard. I now find and decide as follows.
(A)
(i)
To the extent now being considered, the petition and cross petition have been brought for construction of the trust. In construing language in a trust agreement, this court (Mattina, S.), in Matter of Campbell (171 Misc 2d 892, 898-899 [1997]), said:
“Because, upon the grantor’s death, the trust agreement functions as a will substitute or will equivalent, it becomes, at that point, primarily a reflection of the intention of one person, the testatrix/ grantor, concerning the disposition of her property. It is the testatrix/grantor’s intention that is of signal importance in this proceeding.”
Thus, the general principles that apply in will construction proceedings apply in the same manner and with equal force in trust construction proceedings. (See Matter of Stiefel, 24 AD3d 994, 996 [2005].)
It is axiomatic that, in construing the terms of a will, the court’s focus is “to ascertain and give effect to the testator’s intent” (Matter of Bonanno, 151 AD3d 718, 719 [2017]). A *365 testator’s intent is “to be gleaned, if possible, from within the four corners of the will itself” (Matter of Cord, 58 NY2d 539, 544 [1983]), and “the best indicator of the testator’s intent is found in the clear and unambiguous language of the will itself” (Matter of Scale, 38 AD3d 983, 985 [2007]). “All rules of interpretation are subordinated to the requirement that the actual purpose of the testator be sought and effectuated as far as is consonant with principles of law and public policy” (Matter of Fabbri, 2 NY2d 236, 239-240 [1957]; see also Matter of Levine, 136 AD3d 920, 921 [2016]).
Where the intent is unambiguous, “[e]xtrinsic evidence is inadmissible to vary the terms of a will” (Matter of Wickwire, 270 AD2d 659, 661 [2000]; see also Matter of Chernik, 150 AD3d 728 [2017]). Put. another way, there is a “well-established rule that extrinsic or parol evidence cannot be used to create an ambiguity in an otherwise clear [document]” (Matter of Maikowski, 7 Misc 3d 889, 892 [2004], revd on other grounds 24 AD3d 258 [2005]).
(ii)
In determining whether a child in útero is to be considered “living” for purposes of estate-related matters, EPTL 2-1.3 (a) (2) provides, inter alia, that
“[u]nless the creator expresses a contrary intention, a disposition of property to persons described . . . as the issue, children, descendants, heirs, heirs at law, next of kin, distributees (or by any term of like import) of the creator or of another, includes . . . [c]hildren conceived before, but born alive after such disposition becomes effective” (emphasis added).
Further, EPTL 4-1.1 (c) states that “ [distributees of the decedent, conceived before his or her death but born alive thereafter, take as if they were born in his or her lifetime.”
As the court stated in Matter of Holthausen (175 Misc 1022, 1024-1025 [1941]):
“It has been the uniform and unvarying decision of all common-law courts in respect of estate matters for at least the past two hundred years that a child in ventre sa mere is ‘born’ and ‘alive’ for all purposes for his benefit. . . . Every recent decision in this State relating to estate matters in which the issue has been determined has held that such a child is ‘living’ within the connotation of wills and statutes.”
*366 For example, in In re Meyer’s Estate (119 NYS2d 737, 752-753 [1953]), this court (Buscaglia, S.) held that a provision of a will which left “to each and every issue hereinbefore born of my sons, ... if then living, the sum of Five thousand dollars” necessarily included two children who were in útero at the time of decedent’s death but were born thereafter. In doing so, this court noted “the opinion of Lord Chancellor Hardwick in Wallace v. Hodson, 26 English Reprint 472, to the effect that: ‘Nothing is more clear than that this law considered a child in the mother’s womb absolutely born to all intents and purposes for the child’s benefit’ ” (id. at 752;[4] see also Matter of Vanderbilt, 183 Misc 508 [1944]; In re Lyons’ Will, 123 NYS2d 681, 683 [1953]).
(B)
It is undisputed that GG was born in 2006, approximately five months after the death of her great-grandfather, and she was in útero at the time of his passing. Respondents contend that, if it had been David’s intent to include great-grandchildren who were in útero at the time of his death and born thereafter, he would have included specific language to that effect. However, EPTL 2-1.3 (a) does not require an affirmative inclusion of such members of the designated class (here, great-grandchildren living at the time of David’s death); rather, such members are necessarily included unless there has been an affirmative exclusion (“[ujnless the creator expresses a contrary intention”).
The exclusion of persons from a designated class was clearly understood by David. In the trust as executed by him in 1999, David provided as follows: “References to descendants of any degree include adopted persons if adopted prior to attaining majority but not otherwise” (Article THIRTEENTH [D] [“Definitions”]).[5]
However, in the July 2002 second amendment to the trust, David reconsidered the possible inclusion of certain adopted persons within the term “descendants”:
“HI. Paragraph D of ARTICLE THIRTEENTH: Definitions shall be amended to read as follows:
*367 “(D) References to descendants of any degree do not include adopted persons at any age” (emphasis added).
Thus, David excluded “adopted persons” from the internal trust definition of “descendants.” Significantly, too, his language also removed any possible application of EPTL 2-1.3 (a) (1) to the trust because of the expression of his contrary intention that “adopted persons” should not be considered “descendants” of his “of any degree.”
A trust grantor, like a testator, “is presumed to have known the law” (Matter of Smith, 110 App Div 421, 422-423 [1905]), and the law has been clear for over two centuries before this trust was created that those in útero when a grantor dies but who are born alive thereafter are “living” within the meaning of a trust provision such as that contained in Articles THIRD and FOURTH of this trust. David expressed no intention to exclude great-grandchildren who were in útero at the time of his death but born thereafter from the class of great-grandchildren “living” at the time of his death. Furthermore, Article SEVENTEENTH of the trust provides that, “except as expressly otherwise provided in this instrument, this instrument and the trust created by this instrument shall be construed and governed in all respects by and in accordance with the law of the State of New York” (emphasis added).
In seeking summary judgment and opposing Fidelity’s requested relief, respondents have offered hearsay references to David’s religious beliefs and asserted “teachings of the Talmud,” which would, in respondents’ opinion, warrant a result different from that sought by Fidelity. I do not consider any of these submissions, because I have concluded that the trust language is clear and unambiguous on its face, and such extrinsic “evidence” as respondents proffer may not be utilized to create ambiguities where none otherwise exist (see Matter of Chernik; Matter of Maikowski).[6]
Respondents also urge that it would have been unnecessary for David to have included the “living at the time of [his] death” language in describing the class of great-grandchildren who would be entitled to take under Articles THIRD and FOURTH of the trust if he had intended to include those who were in *368 útero but born after his death. This is so, respondents say, because EPTL 2-1.3 itself would have included them.[7]
Respondents would construe the “living at the time of [David’s] death” language to mean that David intended that any such great-grandchild must actually have been born prior to, and still be alive when, he died; as respondents’ memorandum puts it: “Respondents’ interpretation offers a more plausible result because under Respondents’ interpretation, David intended to benefit only his great-grandchildren who were born and alive at the time of his death that he was personally acquainted with and had a personal relationship with” (emphasis added).
I find that David clearly intended to limit the class of great-grandchildren under Articles THIRD and FOURTH and that the “class-closing” event occurred at his death. David, thus, sought to prevent the class from continuing to expand after he died up to the date those trust provisions would actually terminate (an event still not reached more than a decade after David’s death). So viewed, the language in question makes clear an intent to limit the class of great-grandchildren, and case law and the statute thereafter define who is within that class as so limited at David’s death. Construed in that manner the language is not “unnecessary,” “surplus,” or “meaningless.”
Moreover, I do not agree that the phrase “living at the time of [David’s] death,” given the statute and case law, requires that the phrase be construed to require a great-grandchild’s actual birth to have occurred prior to David’s death. It is untenable to construe the language in question as meaning that, as respondents urge, David intended that he be “personally acquainted with and had a personal relationship with” the great-grandchildren to be included in the class. Suppose, for example, that the great-grandchild at issue was born hundreds of miles away from David’s location and five minutes before David died—where is the “personal acquaintance” or “personal relationship” with that great-grandchild? And if “personal acquain *369 tance” or “personal relationship” is the touchstone of what David intended, then why was that language not used?
I find that respondents’ proposed construction is not warranted, and it may not be adopted.
I conclude, therefore, that GG is a great-grandchild who was “living” at the time of David’s death within the meaning of the statute(s) and case law, and within the intendment of the provisions of Articles THIRD and FOURTH of the trust, and that she is entitled to take under those provisions.
Accordingly, I hereby deny respondent’s motion for summary judgment and grant summary judgment to Fidelity (see Dunham v Hilco Constr. Co., 89 NY2d 425, 429-430 [1996]; see also Martinez v City of Buffalo, 149 AD3d 1469, 1470 [2017]); I hereby grant Fidelity’s petition to the extent of its request for advice and direction; and I deny respondents’ cross petition.

. The trust, as so amended, will be referred to here as the trust.

. GG is the daughter of David’s granddaughter Kelley Inger Wolfenson.

. Respondents are David’s great-grandchildren through his granddaughter Alana Sue (Fischbein) Payne (Zoe Payne) and his grandson William Stewart Fischbein (Nathan Fischbein and William David Fischbein), and all were born prior to David’s death.

. Wallace v Hodson was decided on January 22, 1740, over 277 years ago, and its principle quoted here has been applied consistently since.

. The definitional provision narrowed the effect that EPTL 2-1.3 (a) (1) (“Adopted children and their issue in their adoptive relationship [s] ”) might otherwise have had in construing any reference within the trust “to descendants of any degree.”

. Parenthetically, it is clear that a court, in adjudicating a matter, may not “conduct[ ] an inquiry into religious law [or] beliefs” (Matter of Congregation Yetev Lev D’Satmar, Inc. v Kahana, 31 AD3d 541, 542 [2006], affd 9 NY3d 282 [2007]; see also Badesha v Soch, 136 AD3d 1415, 1416 [2016]).

. Under this view, respondents contend that this court would have to conclude that the “living at the time of [David’s] death” is “unnecessary or surplus language,” thereby violating the requirement to give effect to all language in an instrument. (See e.g. Matter of Crocitto Family Trust, 2016 NY Slip Op 32642[U], *6 [Sur Ct, Nassau County 2016] [“in the construction of a will or trust instrument ‘words are never to be rejected as meaningless or repugnant . . (Matter of Gulbenkian, 9 NY2d 363, 370 [1961] . . .)”].) I do not agree with respondents’ analysis.